**Benjamin Edward SMITH et al.**

v.

**Raymond W. VOWELL et al.**

**Civ. A. No. SA-72-CA-285.**

United States District Court,
W. D. Texas,
San Antonio Division.

June 27, 1974.

---

Barry Snell, Stanley Dalton Wright, Melvin N. Eichelbaum, Bexar County Legal Aid Association, San Antonio, Tex., for plaintiffs.

Robert W. Gauss, Asst. Atty. Gen., Austin, Tex., for defendants.

William S. Sessions, U. S. Atty., Hugh P. Shovlin, Asst. U. S. Atty., San Antonio, Tex., John B. Rhinelander, Gen. Counsel, Dept. of Health, Ed. and Welfare, Washington, D. C., John M. Stokes, Regional Atty., office of Gen. Counsel, Dept. of Health, Ed. and Welfare, Dallas, Tex., for HEW.

## OPINION

CLARY, Senior District Judge.

This is a class action brought under 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3) and (4) seeking injunctive and declaratory relief pursuant to 28 U.S.C. § 2201 and § 2202 against the State of Texas and its Department of Public Welfare for their alleged failure to comply with the provisions of the Social Security Act of 1935, 42 U.S.C.A. §§ 1302, 1351 et seq. and 1396 et seq. and the regulations promulgated thereunder, 45 C.F.R. 249.10(a)(5) in the operation of the state Medicaid program (Title XIX). The jurisdiction of this Court is unchallenged. Plaintiffs allege in this case of virtually first impression [1] that the State of Texas has failed to promulgate a "state plan" for medically necessary transportation for the recipients of Medicaid in conformity with 42 U.S.C.A. *supra* [2] and 45 C.F.R. *supra* and the named plaintiff alleges that, as a result, he, individually, for a period of years [3]

---

1. Buffington v. Venable, Civil Action No. 14279, (N.D.Ga., Sept. 22, 1971) (unreported) is the only case on point cited by either of the parties and was dismissed on grounds of mootness, *see* discussion, *infra*.

2. *See, e. g.*, King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968) and other cases cited *infra*.

3. The instant regulation took effect July 1, 1970 and although not specially stated (see,

has lacked such transportation to providers of necessary medical treatment. Although the plaintiffs do not so allege, such lack of compliance with the applicable Federal law would also be in violation of Article VI of the Constitution, the Supremacy clause.[4] The named plaintiff further seeks retroactive benefits for himself.

Ancillary relief is also sought to declare that the dismissal for being out of time [5] of the named plaintiff's administrative appeal from the Department's denial of transportation violates the Due Process Clause of the Fourteenth Amendment, the Social Security Act, 42 U.S.C. 139.(a)(3), the regulations promulgated thereunder, 45 C.F.R. § 205.-10(a)(3)(ii), and the Department's own Administrative Procedures Handbook, Section 1212 and the Texas Medical Assistance Act of 1967, Vernon's Tex. Rev.Civ.Stat.Ann. art. 695j–1, Sec. 9. Injunctive relief is also sought on behalf of the alleged class of those persons who complain of Department denials of financial or medical benefits of a continuing nature and whose complaints are similarly dismissed for being out of time.

The case was tried upon a stipulated set of facts incorporating the named plaintiff's factual allegations in his pleadings, the attached exhibits, the defendant's answer and the affidavit and accompanying exhibits of defendant Vowell, the deposition of defendant Zalaznick and the exhibits attached to the stipulations. No witnesses were called.

Nevertheless, since the central question in this case is the proper interpretation of the regulations administered by the Department of Health, Education and Welfare (hereinafter HEW), this Court has followed the command of the Supreme Court in Rosado v. Wyman, *supra*, 397 U.S. at 407, 90 S.Ct. 1207,[6] and has asked HEW to lend its expertise and to file a Brief of *Amicus Curiae* which has been so submitted to the Court.

## I. STATEMENT OF THE CASE

The named plaintiff, Benjamin Edward Smith, 24 years old, has been a victim of spastic cerebral palsy (Stipulation 3) since birth and has been a recipient of categorical assistance, Aid to the Permanently and Totally Disabled (APTD) (Stipulation 2), under the Title XIX Medicaid Program since April 3, 1969. The plaintiff has been a ward of the state since he was two years old (April 15, 1953) (Stipulation 6); he has no family and no resources other than those provided by the State (Stipulation 4). He lived entirely in various foster homes until 1969 when he reached the aid requirement for Medicaid and since then he has lived entirely in various nursing homes and hospitals (Stipulation 7).

Benjamin Edward Smith is totally disabled. He is confined to a wheelchair —which he cannot operate himself. His doctor describes him as requiring "total care" (Stipulation 11): He is palsied to the extent that he can neither walk, feed, nor dress himself—nor perform

---

*e. g.* Exhibits II–A, II–II, plaintiff's complaint) it would appear as if the named plaintiff is complaining of a denial of necessary medical transportation from the inception of the effective date of regulation.

4. *See, e. g.*, King v. Smith, *supra*; Townsend v. Swank, 404 U.S. 282, 285–286, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971); Rosado v. Wyman, 397 U.S. 397, 408, 90 S.Ct. 1207, 25 L. Ed.2d 442 (1970) and other cases cited *infra*.

5. Plaintiff alleges that the Department and the defendant Saul Zalaznick, Appeals Analyst, dismissed his appeal on the grounds

that it was not filed within sixty (60) days· (see Section 1212, Texas Administrative Procedures Handbook) of the Department's first denial of transportation. The defendants dispute this interpretation and the exact posture of this aspect of the case remains in some ambiguity. *See, infra* at 43 et seq.

6. *See* also Catholic Medical Center of Brooklyn and Queens, Inc. et al. v. Rockefeller et al., 305 F.Supp. 1256 at 1267 (E.D.N.Y.) (1969) aff'd, 430 F.2d 1297 (2 Cir.), app. dismissed 400 U.S. 931, 91 S.Ct. 246, 27 L. Ed.2d 262.

any other normal daily functions without assistance (Stipulation 9). Nor, apparently, can he speak without difficulty.[7]

In addition to his primary illness, plaintiff Smith suffers from numerous secondary including chronic peptic esophagitis, disphagia, and a neurogenic bladder which has required the construction of an artificial bladder (Stipulation 10). The complexity and severity of his disorders is of such a magnitude that no single doctor or clinic is capable of treating him.

His visits to doctors and clinics require transportation at least three (3) days a week (see attached chart—Appendix I—stipulated to by the parties) in addition to emergency transportation for recurrent urinary and ear problems.

Consequently, the gravamen of the named plaintiff's complaint is that " . . . The State Department of Public Welfare is unable to assure the availability of transportation of plaintiff to and from the providers of medical services." (Stipulation 35; see also Stipulation 36).

■ The plaintiff, for example, requires visits [8] to rehabilitation therapy twice a week; to the Gastroenterology Clinic once a month; to the Orthopedic Clinic once a month; to the Hand Clinic once a month; to a private urologist at least once a month.[8a] The combined trips total somewhere between twelve–fifteen trips per month [8b] excluding emergencies and visits to the Hand Clinic and Adult Neurology Clinic scheduled every three months. It has been stipulated that each of these treatments requires transportation to and from (Stipulation 13), and we also take judicial notice that the day of the house call is long since gone. Moreover, it has been stipulated that the named plaintiff requires some kind of transportation, e. g., ambulance, van, or truck with an hydraulic lift, that would allow him to remain in his wheelchair or be carried by litter (Stipulation 14). It has further been demonstrated [9] that since 1970 the State has provided ambulance service on a total of four occasions.

Benjamin Smith's total monthly income of $25.00 from his "Personal Needs" allowance [10] provided by the State is insufficient to pay for even one ambulance trip per month (Stipulation 15) (ambulance rates are $40.00 per round trip plus $10.00 per hour waiting time—(Stipulation 29) even if such an expenditure by a welfare recipient were permissible under the Social Security regulations which it may not be anyhow.[11]

---

7. Exhibit II–A, letter from Kenneth B. Washburn, M.D. attached to Complaint and incorporated by reference, Stipulation 51, into the trial record along with other attached exhibits.

8. See letter, Exhibit II–G attached to complaint.

8a. The letter from the urologist, Dr. Burkholder attached to the complaint as Exhibit II–A is illustrative in this regard as to the extent of the plaintiff's medical needs: "In September of 1970, Benjamin Smith underwent construction of an artificial bladder (ileal conduit) for a neurogenic bladder created by cerebral palsy. This patient still needs nursing care to change his appliance at least every four days and to administer his many medications. At the present time, I have been seeing this patient every 2 to 4 weeks, to irrigate infected secretions from his bipassed bladder. This requires his getting a taxi to and from my office or a friend to drive him. His bladder must be irrigated free of this infected secretion and Neomycin solution is replaced in the bladder. I purchase the medications myself, at my own expense, in order to help this patient. It would be helpful to him to have enough financial aid to cover these visits to the hospital."

8b. See Chart attached as Appendix I.

9. See Chart of Payments by the State of Texas attached to Stipulations.

10. The $25.00 per month is intended to cover all of the plaintiff's personal needs and miscellaneous expenses "including but not limited to, clothing, telephone, laundry, transportation, hearing aid upkeep, insurance premiums, diabetic supplies, home remedies, recreation, household equipment and supplies, etc." (Stipulation 28).

11. See HEW Medical Assistance Manual, MSA–PRG–17 at 6 which provides, in pertinent part: "Inclusion of the cost of travel

Moreover, the only kind of transportation which plaintiff Smith can afford— taxicabs—is both too little (he can only afford one or two taxi trips per month (Stipulation 16); too inadequate (he cannot remain in his wheelchair but must be "lifted in and out of taxicabs like a lifeless manikin" in his lawyer's chilling words); [12 & 13] too dangerous (one taxicab driver broke the plaintiff's foot by catching it in his wheelchair as he was lifting the plaintiff in and out of the cab); [14] and, finally, not even then available with some degree of assurance, for some drivers upon observing the plaintiff's plight have refused to permit him in their cabs.[15]

We must now turn to the transportation capability of plaintiff Smith's friends and of volunteer organizations, as the above cited Medical Assistance Manual MSA–PRG–17, "Transportation of Recipients" id., mandates that the states are to hold down the costs of medical transportation of the needy by the utilization of volunteer resources whenever possible:

"Although the State has an obligation to assure that transportation will be available for recipients to and from medical care, it also has an obligation to assure that payment is made only where transportation is not otherwise available. If neighbors, friends or voluntary organizations have been providing a service it is reasonable to expect them to continue except in the face of markedly changed circumstances or evident hardship." "Implementation of Regulation; D. Administrative Controls."

This issue has, however, been expressly settled by stipulation. Stipulations 31–35 provide a summary of the volunteer efforts and corresponding failures [16] to transport the named plaintiff to and from his medical providers. Personal friends, Red Cross, VISTA, F.I.S.H., nursing homes, the Easter Seal Foundation and other volunteer agencies have all been tried and individually and collectively, have been found wanting.[17] Nor, apparently, are the hospital personnel (and one would assume the clinic

---

as an item of the money payment is feasible in some instances. . . . The appropriateness of its use would depend on the State plan approved under one of the other assistance titles. Thus, the money payment approach would not be applicable to the medically needy or to categorically needy not receiving money payments. . . . It would not be suitable however, if money grants are subject to maximums or percentage reductions." Although the record is not crystal clear in this regard, it would appear as if such moneys are subject in Texas to maximums or percentage reductions. See, infra at 39–40.

12. Plaintiffs' Trial Brief at 27.

13. See letters of George E. Dasaro, M.D., Exhibit II–E to plaintiffs' Complaint, "He has been using a taxi for approximately one year which has not been adequate or suitable," and those of Lionel Rodriguez, M.D., Exhibit II–F and Gail Pounders, Medical Special Worker, University of Texas Medical School, Exhibit II–G.

14. Rodriguez and Pounders letters, supra.

15. Pounders letter, supra.

16. See, e. g., Stipulation 33: "Prior to the administrative hearing in this case, caseworkers employed by the State Department of Public Welfare contacted the American Red Cross, VISTA, F.I.S.H. and several other community agencies in attempts to obtain regular transportation for plaintiff. The Department was successful in obtaining transportation for plaintiff but were (sic) unable to sustain such arrangements." See also Zalaznick deposition at p. 16, lines 2–25, p. 17, line 1.

17. Moreover, the possibility of injury to plaintiff Smith is not confined to taxicab drivers. See the letter of State Social Worker, Charles W. Murray, attached to deposition of defendant Zalaznick: ". . . Volunteers, generally untrained to handle patients with this condition, were reluctant to carry him because of the fear of causing injury." and Zalaznick deposition at p. 53, lines 8–12. See also Pounders' letter, supra: "No local agency has been willing to provide transportation as Ben must be lifted in and out of the car along with his wheel chair. This cannot be done by women. The hospital does not have an orderly service to lift patients. . ."

personnel as well) prepared to undertake this task.[18]

The Department's own caseworkers were unable to obtain regular transportation for plaintiff Smith [19] and in the words of the State Appeals Analyst who dismissed his appeal, "he [the caseworker] ran up against a blank [sic] wall in his attempt to obtain transportation."[20] Similarly, the plaintiff's attorneys and their staff attempted and failed to obtain the necessary transportation.[21]

Finally, the plaintiff's doctors appear to be gravely concerned with his transportation difficulties as having a direct and causally injurious effect upon the course of his medical treatment. Dr. Kenneth B. Washburn of the University of Texas Medical School writes: "The *greatest problem* . . . for this patient has been the inability to carry through with a complete program due to transportation difficulties."[22] (emphasis added).

Dr. Charles L. Simpson also of the University of Texas Medical School and the Bexar County Hospital District writes of the plaintiff: "He appears to be well motivated and very interested in his occupational and physical therapy but has a great deal of difficulty with transportation to and from the hospital . . . as well as transportation for clinic visits and emergency room visits when necessary. He presently has to pay for transportation from his very limited resources and due to his inability to attend therapy regularly his difficulty with contractures is accelerating rapidly . . . I realize that Ben's rehabilitation potential is very limited, but his visits to physical therapy and occupational therapy are one of the few things that Ben looks forward to . . . I only ask that you seriously consider him for any aid which you can possible give to this deserving and tremendously unfortunate person."[23] (Dated September 4, 1970).

The other letters [24] attached to the Complaint from Benjamin Smith's doctors are all powerful cumulative testimony of this man's extreme medical needs and the necessity of transportation to remedy these needs.

Nevertheless, after all the transportation efforts has failed, the Department of Public Welfare still refused to provide plaintiff Smith with the transportation appropriate and necessary for his medical condition, the named plaintiff requested a formal hearing within the Department. His request was received by the Department on February 8, 1972 (Stipulation 37) and an Administrative Hearing was held on March 14, 1972 with defendant Zalaznick assigned as the hearing examiner and Appeals Analyst (Stipulations 38 and 39).

At the hearing on March 14, "the evidence presented . . . demonstrated the medical necessity for the requested transportation" (Stipulations 40 and 41), but the plaintiff Smith's appeal was dismissed on the procedural grounds that he "had not filed his appeal within 60 days of that date when the State Department of Public Welfare first failed to provide the requested transportation." (Stipulation 43). The instant litigation was thereafter commenced on behalf of the named plaintiff and the class of plaintiffs. The class is defined as all those needy individuals in the State of Texas, receiving categorical assistance from the State Department of Public Welfare, who presently and prospectively need to obtain transportation to and from the providers of necessary medical services. By failing properly to formulate and implement a State Medical Assistance plan with regard to trans-

18. Pounders' letter, *id.*

19. *See* n. 16 *supra;* Stipulations 32–35, and Zalaznick deposition, *supra* at p. 18, lines 18–25, p. 19, lines 1–23.

20. Zalaznick deposition, at p. 19, lines 15.

21. Affidavit of John Cowan, Exhibit II–II to plaintiffs' Complaint.

22. Exhibit II–A, *supra.*

23. Exhibit II–B.

24. Exhibits II–C to II–F.

portation, the State has acted on grounds generally applicable to the class under Rule 23(b)(2) and the relief sought and granted is of an injunctive and declaratory nature, Advisory Committee's Note, 39 F.R.D. 98 at 102, and therefore the case does not fall within the ambit of the notice requirements of Eisen v. Carlisle and Jacquelin, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732, which pertains to Rule 23(b)(3) actions, at 165, 172–174, 176–177 n. 14, 94 S.Ct. at 2145, 2150, 2152 n. 14. The defendants have nowhere challenged the existence of the class and, in fact, have conceded their inability to provide the necessary medical transportation to "all welfare recipients in this connection"; [25] and we therefore determine this matter to be the proper form of litigation to be certified as a class action under Rule 23.

## II. STANDING

■ Defendants have challenged the plaintiffs' standing to seek judicial review of this matter and, by inference, have also alleged their failure to exhaust administrative remedies.[26] The defendants assert that "HEW is the proper forum to which the plaintiff's complaint should be addressed as "the Secretary [of HEW] is designated to administer Federal funds and to asure that State compliance with program regulations is maintained." A similar contention was raised and decisively rejected by the Supreme Court in Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). This position was further explicated and broadened in NWRO v.

Finch, 139 U.S.App.D.C. 46, 429 F.2d 725 (1970) which quickly followed Rosado. We hold these cases entirely dispositive of the issues before us.

In Rosado, Mr. Justice Harlan writing for the majority [27] pointed out the patent futility of an approach such as that advocated by the defendants for the simple reason that there are no administrative remedies within HEW for welfare recipients to invoke let alone exhaust:

> "Neither the principle of exhaustion of administrative remedies nor the doctrine of primary jurisdiction has any application to the situation before us. Petitioners do not seek review of an administrative order, *nor could they have obtained an administrative ruling since HEW has no procedures whereby welfare recipients may trigger and participate in the Department's review of state welfare programs.* Cf. Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); K. Davis, Administrative Law § 19.01 (1965); L. Jaffe, Judicial Control of Administrative Action, 425 (1965)." *Id.*, 397 U. S. at 406, 90 S.Ct. at 1215 (Emphasis added).

He went on to write that the Court has:

> ". . . rejected the argument that a federal court is without power to review state welfare provisions . . . Congress has lodged in the Department of HEW the power to cut off federal funds for non-compliance with statutory requirements . . .

---

25. Affidavit of Vowell (Commissioner of Public Welfare) at 5.

26. There is also a clear line of cases holding that where an action is brought under the Civil Rights Act, 42 U.S.C.A. § 1983, the Court need not consider the question of exhaustion of administrative remedies (or, for that matter, abstention). *See*, Monroe v. Pape, 365 U.S. 167, 180, 183, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967); King v. Smith, 392 U.S. 309, 312 at n. 3, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968)

and Owens v. Parham, 350 F.Supp. 598, 600 (N.D.Ga.1970).

27. *See* also concurring opinion of Justice Douglas, 3rd at 426, 90 S.Ct. at 1225:
 "The statutory provisions for review by HEW of state AFDC plans do not permit private individuals, namely, present or potential welfare recipients, to initiate or participate in these compliance hearings. Thus, there is no sense in which these individuals can be held to have failed to *exhaust* their administrative remedies by the fact that there has been no HEW determination on the compliance of a state statute with the federal requirements."

[citing to King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968)] implicitly rejected the argument that the statutory provisions of HEW review of plans should be read to curtail judicial relief." *Id.* at 420, 90 S.Ct. at 1222.

It should be noted that *Rosado* further teaches us, *id.*, 397 U.S. at 406–407, 90 S.Ct. 1207, that the district courts are to seek the opinion of the Department of HEW when faced with issues such as those presented in this case. This we have done, and nowhere in the Brief of *Amicus Curiae* submitted by HEW is there a word that indicates any challenge to the right of the plaintiffs to bring this action. Certainly, if HEW believed that its authority and that of its Secretary were being contravened by the plaintiffs' litigation, the brief would have addressed itself to this issue rather than to the merits themselves.[28]

The Court of Appeals for the District of Columbia (per Wright, J.) in NWRO v. Finch, *supra* exhaustively treated the question of standing in welfare cases. The court there reviewed the principles of determining standing as enunciated in Association of Data Processing Service Organizations v. Camp (hereinafter *Data Processing*), 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) and Barlow v. Collins (hereinafter *Barlow*), 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).[28a]

" . . . standing for purposes of judicial review need not flow from any express Congressional grant. In Association of Data Processing Service Organizations, Inc. v. Camp [citation] and Barlow v. Collins [citation] . . . standing to challenge administrative action was found to turn on a flexible, liberalized formula in which two conditions are central: (1)

whether the plaintiff alleges that the challenged action has caused him injury in fact economic or otherwise and (2) whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute . . . in question." Citing *Data Processing, supra*, 397 U.S. at 152–153, 90 S.Ct. 827. *Id.*, 429 F.2d at 733.

The third requirement would be one of Congressional intent; *id.*:

" . . . The Court must decide if Congress has in express or implied terms precluded judicial review or committed the challenged action entirely to administrative discretion." Citing *Barlow, supra*, 397 U.S. at 165, 90 S.Ct. 832.

The Court readily found[29] that the plaintiff welfare recipients fit all three requirements. First, as to "injury in fact, economic or otherwise", being the recipients of welfare benefits, "they no doubt have the requisite 'personal stake in the outcome' of the suit—an economic stake." *Id.*, 429 F.2d at 734 citing Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Secondly, as to the "zone of interest" requirement, "the purposes of the Social Security Act make clear that appellants, if qualified as welfare recipients . . . fall within the class of persons intended as beneficiaries of that statute." *Id.*, 429 F.2d at 735. Thirdly, there is the issue of an express or implied precluding of judicial review by Congress or the relegation of the challenged action to agency discretion. The Court in *NWRO* found (a) "no language in the Social Security Act expressly prohibiting welfare recipients' pursuit of review," *Id.* (b) no implied exclusion of welfare recipients, as such an implication according to the tests enunciated in *Barlow, supra*, 397

---

28. *See infra.*

28a. *See also* 6 Wright and Miller Federal Practice and Procedure at § 1542; 7 Moore § 65.17 at 65–128–129; Albert, "Standing to Challenge Administrative Action," 83 Yale L.J. 425 (1974); Davis, "The Liberalized Law of Standing," 37 U.Chi.L.Rev. 450

(1970); Jaffee, "Standing Again," 84 Harv. L.Rev. 633 (1971).

29. "Appellants have no difficulty in satisfying the two requirements of standing announced in *Data Processing Service—Barlow*." *Id.*, 429 F.2d at 735.

U.S. at 166, 90 S.Ct. 832 and in Abbott Laboratories v. Gardner, *supra* (cited in *Barlow*) is an "exception [to the rule] which must be demonstrated," *id.*, and (c) finally, nonreviewability will be found " 'only upon a showing of clear and convincing evidence' of legislative intent." (citing *Abbott Laboratories, supra*).

We hold that in this regard the case at bar is all fours with NWRO v. Finch. The named plaintiff Smith and the class plaintiffs explicitly fit the description of the successful plaintiffs in NWRO who "as recipients of benefits of welfare assistance programs . . . no doubt will have the requisite 'personal stake in the outcome' of the suit." *Id.*, 429 F.2d at 734. The second requirement that the plaintiffs be within the zone of interests protected by the statute is easily met for the category of plaintiffs—welfare recipients—is identical in both cases and the statute sued under—the Social Security Act of 1935 and amendments—is also identical. Mr. Justice Harlan's words in *Rosado* seem particularly apposite in this regard: "We are most reluctant to assume Congress has closed the avenue of effective judicial review to those individuals most directly affected by the administration of its program. Cf. Abbott Laboratories v. Gardner [citation]." *Id.*, 397 U.S. at 420, 90 S.Ct. at 1222.[30]

Finally, defendants argue that since the instant case involves the interpretation of an administrative[31] rather than a statutory provision that it in some way can be distinguished from the above cases. Defendants cite no authority for this proposition for the simple reason that none exists. Beginning with King v. Smith, *supra*, 392 U.S. at 317, 88 S. Ct. 2128 the Supreme Court has held that there can be no question as to the authority of the regulations promulgated by HEW in this area. The law itself speaks to the issue in 42 U.S.C. § 1302[32] with its provision that the Secretary of HEW shall make and publish such rules and regulations that are not inconsistent with the Social Security Act and which may be necessary to the efficient administration of the act.

To conclude, we find the Court's ruling in *Rosado* the dispositive law as applied to this case, and we also find compelling its language as to the important policy considerations involved in affording access to the courts for welfare recipients seeking judicial review of alleged errors in the administration by the states of the Social Security program:

" . . . We find not the slightest indication that Congress meant to deprive federal courts of their traditional jurisdiction to hear and decide federal questions in this [Social Security] field . . . . It is, on the other hand, peculiarly part of the duty of this tribunal, no less in the welfare field than in other areas of the law, to resolve disputes as to whether federal funds allocated to the States are being expended in consonance with the conditions that Congress has attached to their use." *Id.*, 397 U.S. at 422–423, 90 S.Ct. at 1223.

## III. STATE PLAN REQUIREMENTS

### A. BACKGROUND

The origins of the present program can be found in the early New Deal com-

---

30. *See also Barlow*, 397 U.S. at 167, 90 S.Ct. at 832:

"The right of judicial review is ordinarily inferred where congressional intent to protect the interests of the class of which the plaintiff is a member can be found." *Id.* at 167, 90 S.Ct. 832.

31. For cases impliedly affirming the application of the "zone of interest" test as applied to *administrative* regulations, *see* Springfield Television, Inc. v. City of Springfield, Mo., 462 F.2d 21, 23 (8th Cir.) (1972) and Clark v. United States, 482 F.2d 586, 590 (8th Cir.) (1973).

32. "The Secretary of . . . Health, Education, and Welfare, . . . shall make and publish such rules and regulations, not inconsistent with this chapter, as may be necessary to the efficient administration of the functions with which [he] is charged under this chapter." *Id.*

mitment to assist the states in paying the medical expenses of the needy. CCH Medicare and Medicaid Guide, ¶ 14,020, p. 6035. The program grew consistently through the next three decades, *id.* at 6036 when it became a priority of Lyndon Johnson's Great Society programs. In his Special Message to the Congress on the Nation's Health in February, 1964 [33] and his State of the Union Message in 1965, he emphasized medical care for the needy as a keystone of his domestic legislative program. In turn, Congress passed both Medicare and Medicaid and President Johnson signed them into law on July 30, 1965,[34] as Title XIX to the Social Security Act.[35]

Title XIX authorized a cooperative Federal-State program ("cooperative Federalism") under which certain medical services would be made available to welfare recipients at no cost to them.

The State of Texas began its participation in the Medicaid Program in 1967 with passage by the Legislature of the Texas Medicaid Assistance Act. Administrative responsibilities for the new program were placed with the State Department of Public Welfare.

Under Title XIX, the participating State obtains matching Federal funds to extend medical and financial assistance to certain categories of needy persons such as aid to the permanently and totally disabled (APTD). In order to obtain these matching funds, the Social Security Act requires, 42 U.S.C.A. § 1396a et seq., the state to formulate a "state plan" for the administration of the various programs in accordance with the applicable provisions of the Social Security Act and the regulations promulgated thereunder.[36]

The specific regulations which are at issue in the case at bar are set forth as follows at 45 C.F.R. 249.10(a)(5):

"(a) *State Plan Requirements.* A State plan for medical assistance under Title XIX of the Social Security Act must:

\* \* \* \* \* \*

(5) . . . specify that there will be provision for assuring necessary transportation of recipients to and from providers of services and describe the methods that will be used."

HEW has interpreted the application of the above regulation in "Program Regulation Guide," MSA–PRG–17 [36a] issued June 6, 1972.[37] & [37a]

The "Program Regulation Guide" further points out that the problem of medical transportation for the needy as an area of Federal concern has been recognized for some time prior to the inception of the present programs:

"Under provisions of the Social Security Act *prior to the enactment of Title XIX, State agencies were permitted to obtain Federal financial participation for transportation* and related travel expenses incident to securing medical services for public assistance

33. The American people ". . . need, and they can afford the best of health—not just for those of comfortable means—but for *all* our citizens, old and young, rich and poor . . . there is no room for second-class health services. . . . Too many Americans still are cut off by low incomes from adequate health services. . . . The linkage between ill-health and proverty in America is all too plain. . . . But our remaining agenda is long, and it will be unfinished until each American enjoys the full benefits · of modern medical knowledge." Collected Papers of the Presidents, Lyndon B. Johnson 1963–1964 at 275–276.

34. CCH Medicare and Medicaid Guide, *supra* at 6036.

35. Codified as 42 U.S.C.A. § 1396 et seq. (1970) as amended (Supp. 1973).

36. 42 U.S.C.A. § 1302; *see supra* at 15 and n. 32.

36a. *See* also MSA–PRG–18; "Free Choice of Providers" at 4 and 5.

37. Effective date, July 1, 1972.

37a. MSA–PRG–17 describes itself on the cover page as "The interpretation and guidelines for the use of Title XIX agencies in implementing the requirement that eligible individuals be assured of transportation necessary to get to and from medical care."

recipients . . ." *Id.* at 2. (emphasis added).

The regulations promulgated under the present Medicaid program may be seen as the culmination of the earlier efforts for:

> The Medicaid Program from the start has encouraged States to provide or arrange for transportation of recipients to and from necessary medical care. Transportation was listed in Supplement D of the "Handbook of Public Assistance Administration" as the *second of the criteria for assuring high quality of care.* "Handbook" supplement D–5130, item 2.b). In addition, encouragement was provided through a broad definition of transportation for which Federal funding participation was available. ("Handbook" Supplement D–5141, item 15.a). *Id.* (emphasis added).

The promulgation of the transportation requirement would also appear to be a vital component of other sections of the statute whose goal would be to further the Federal government's commitment of ensuring adequate medical care for the needy:

> "This requirement is based on a number of provisions in the statute and regulations requiring that medical assistance be available in all political subdivisions of the State; provided with reasonable promptness to all eligible individuals; furnished in the same amount, duration and scope to all individuals in a group; provided in a manner consistent with the best interests of the recipient; available to eligible recipients from qualified providers of their choice; and with methods found necessary by the Secretary for proper and efficient operation of the State plan."[37b]

*A fortiori,* it is clear that the Secretary of HEW has determined the instant regulation to be "necessary to the efficient administration"[38] of the program,

for the obvious (and common sense) reason that *"needy will not be able to obtain necessary and timely medical care if they are without the means of getting to the providers of the service."*[39] (emphasis added).

As stated, *supra,* however, we have called upon HEW to lend this Court its expertise in this matter and we believe it important at this point to quote at some length from its *Amicus* brief:

> "HEW has long believed that transportation of recipients to and from providers of medical services is an important concomitant of several discrete provisions in the operative Medicaid statute, 42 USCA § 1396 et seq. For example, the basic statute requires that medical assistance be available in all political subdivisions of the State, 42 USCA § 1396a(a)(1). *In many circumstances, this provision could not be implemented in the absence of transportation services* to enable the recipients to obtain needed treatment from specialized facilities and practitioners. The statute also mandates that medical assistance be furnished with reasonable promptness to all eligible individuals, *id.* at (8), and be available to eligible recipients from qualified providers of their choice, *id.* at (23). These statutory requirements would frequently be vitiated in the absence of a State provision for prompt transportation of eligible recipients to and from the qualified providers of their choice. Moreover, the statute requires that medical assistance be furnished in the same amount, duration, and scope to all individuals in the group, *id.* at (10), provided in a manner consistent with the best interest of the recipient, *id.* at (19), and with methods found necessary by the Secretary for the proper and efficient operation of the State plan, *id.* at (4). *The present regulatory requirement that*

---

37b. *Id.* at 1.

38. 42 U.S.C.A., *supra* at § 1302.

39. "Program Regulation Guide," *supra* at 2.

*the State plan assure necessary transportation for recipients of medical assistance was thus clearly necessary to assure the complete implementation of these other statutory provisions.*[40] (emphasis added).

The States, in the opinion of HEW, do, however, have some flexibility in the overall administration and the choice of the particular modes of implementation of the program for:

"It is the State's prerogative to determine *how* this transportation requirement will be met. Federal funds are available under Title XIX if the State chooses to provide transportation services as part of the medical assistance plan (citing 45 C.F.R. 10(b)(15)(1) or as an administrative cost."[41] (emphasis added).

Therefore, according to HEW, while the choice of means involved is at the State's discretion, the specific goal of adequate medical transportation for the needy is a mandatory duty:

"*However, in some fashion, the State must now assure necessary transportation services to recipients of medical assistance.*"[42] (emphasis added).

The Medical Assistance Manual, "Program Regulation Guide" MSA–PRG–17 itself suggests several most helpful plans [43] that would provide the necessary transportation and which also might reduce the cost burden for the State. Such plans might include the securing of previously existing state-owned equipment such as school buses, station wagons, medi-buses, airplanes and helicopters; or by using local police and fire emergency equipment and ambulances; or by making arrangements with volunteer or-

ganizations such as the American Red Cross or the National Easter Seal Society.[43a] Prepaid or contract plans are also suggested.

The Medical Assistance Manual, "Program Regulation Guide" also comments that "a state may and undoubtedly will use a variety of transportation systems as well as ways of arranging for and financing them . . . . In any case, however, it is *essential that the State agency establish principles for determining how transportation is to be made available* . . . . These may include primary reliance on public or voluntary efforts or a mixture of ways and means such as those suggested below."[44] (emphasis added). Nevertheless, "*the important thing is that the methods described in the state plan show a commitment to assure that every eligible individual will have transportation necessary for access to any care provided under the plan.*[45]

HEW also recognizes the wide diversity of individual medical needs and the impossibility of anticipating in a State Plan every specialized request for medical transportation;[46] but, that nevertheless, the factor overriding importance which must be *determinative* is that the transportation facilities offered by the state "must be sufficient to assure that it is adequate for each individual's particular combination of physical limitations, geographic location and available sources of care."[47]

 Defendants, however, make considerable issue [48] out of an ambiguity in one sentence of the "Program Regulation Guide" which speaks of the transportation "requirement" as an "administrative one and [which] does not make transportation a required item of

40. "Memorandum of the United States as *Amicus Curiae*" at 1 and 2 (emphasis added).

41. *Id.* at 2.

42. *Id.*

43. *Id.* at 4.

43a. However, the guidelines also warn that "the capability to provide transportation

varies among local chapters"—a caution particularly applicable to the case of the named plaintiff, *supra* at 7 and 8. *Id.*

44. *Id.* at 3.

45. *Id.*

46. *Id.* and 7.

47. *Id.* at 7.

48. Defendants' Trial Brief at 4–6.

service." [49] What HEW is saying here, albeit inarticulately, in the Court's opinion, is that while transportation is not mentioned in the Act as a service specifically mandated by Congress, see 42 U.S.C.A., supra at § 1396a et seq. it is, nevertheless, a "requirement" created "administratively;" to wit, by the promulgation of a regulation by the Secretary of HEW under the authority of 42 U.S.C.A., supra at § 1302.[50] And, as we have seen, supra,[51] such administrative requirements are to be given the full force and effect as the statutes themselves, King v. Smith, supra, and are to be considered as "necessary" to the "efficient administration" of the Act. Additionally, the Social Security Act is in the nature of remedial legislation and is to be liberally construed, Haberman v. Finch, 418 F.2d 664 (2nd Cir.) (1972); Rodriguez v. Celebrezze, 349 F.2d 494 (1st Cir.) (1965); Pippin v. Richardson, 349 F.Supp. 1365 (M.D.Fla.) (1972), and narrow technicalities or a narrow and legalistic interpretation are to be avoided, Schroeder v. Hobby, 222 F.2d 713 (10th Cir.) (1955), as not in furtherance of the intent of Congress and the remedial and beneficent purposes for which the Act was enacted. Brown and Barrett v. United States, 330 F.2d 692 (6th Cir.) (1964); Ewing v. Black, 172 F.2d 331, 6 A.L.R.2d 948 (6th Cir.) (1949); Henry Broderick, Inc. v. Squire, 163 F.2d 980 (9th Cir.) (1947); Ketcherside v. Celebrezze, 209 F.Supp. 226 (D.C.Kan.) (1962); Wray v. Folsom, 166 F.Supp. 390 (D.C.Ark.) (1958). Or, in the words of the Fifth Circuit (per Rives, Bell and Ainsworth, JJ.) in Pleasant v. Richardson, 450 F.2d 749 at 753 (1971): the ". . . Act should be interpreted '. . . in such a manner that its overriding purpose will be achieved, even if the words used leave room for a contrary interpretation.'" citing Haberman v. Finch, supra.

MSA–PRG–17 further emphasizes that costs should, of course, be held to a minimum, wherever possible and observes in "Section D, Administrative Controls" [52] that the payment for transportation should be "made only" where transportation is not otherwise available.[53] The Section goes on to emphasize the need to explore all alternative means of transportation before state funds are to be expended:

"If neighbors, friends or voluntary organizations have been providing a service, it is reasonable to expect them to continue except in the face of markedly changed circumstances or evident hardship."[54]

■ Defendants also cite at some length [55] selected portions of MSA–

---

49. Id. at 2.

50. HEW's Amicus brief is silent as to this point but, presumably, if the defendants' interpretation were correct such a point of view would have been expressed contravening the transportation requirement instead of the adoption of the opposite position.

51. Supra at 15.

52. MSA–PRG–17 at 6–8.

53. Id. at 6.

54. This section is particularly relevant to the instant case for it has been stipulated (Stipulations 31–34) that such volunteer efforts have failed as to the named plaintiff; see also supra.

55. "The requirement that the Title XIX agency assure that the recipient can get to and from all the medical care available under the State plan is an administrative one and does not make transportation a required item of service. (p. 2)
"Not all of the [transportation] methods need involve additional expense to the State agency but may depend on the continuance of cooperative arrangements already in effect with voluntary and public organizations. (p. 3)
". . . a State can not be expected to stipulate in advance every possible transportation arrangement that will be available. (p. 3)
". . . the State would have no obligation to provide transportation for medical care not included under the plan, or to a hospital if the recipient had exhausted the amount of hospital care available to him under the plan . . . (p. 7)
"The requirement . . . that any eligible individual be allowed to obtain medical care from any qualified provider of such service participating in the program should not be construed as obligating the

PRG–17 which they believe uphold their own interpretation of the non-necessity of medical transportation in the state plan. Aside from the passage discussed *supra* on the transportation requirement being "administrative" rather than "required" or mandatory, the other passages cited all go to the perimeters of the means to be used. The defendants have confused the discretion placed in the states as to the variety of transportation modes to be chosen as also including the choice not to provide any transportation at all—or not, at least, to provide any transportation that might cost too much money. Yet, the language of the Social Security Act is to be construed in favor of inclusion rather than exclusion, Delno v. Celebrezze, 347 F.2d 159 (9th Cir.) (1965); St. Luke's Hospital Association v. United States, 333 F.2d 157, cert. den., 379 U.S. 963, 85 S. Ct. 652, 13 L.Ed.2d 557 (6th Cir.) (1964), and narrow and legalistic interpretations are to be disfavored if they conflict with the remedial and beneficent purposes of the act, *supra*.

The second selection excerpted, for example, merely reiterates the goal of keeping costs down by utilizing wherever possible "cooperative arrangements already in effect with voluntary and public organizations."[56] The third selection points out what also has been emphasized, *supra*,[57] that because each case may present "individualized patterns,"[58] a state "cannot be expected to stipulate in advance in every possible transportation arrangement that will be available."[59] It is instructive to note that the full passage ends with the citation quoted *supra*[60] that "the important thing is that the methods described in the State plan show a commitment to assure that every eligible individual will have [necessary] transportation."[61]

The fourth selection excerpted by the defendants from the Guidelines is simply not germane to the present case, for it is undisputed that the named plaintiff's medical care is both necessitous and covered—when he obtains it—by the State plan.[62] This selection speaks of the "State [having] no obligation to provide transportation for medical care not included under the plan" or transportation to a hospital if the recipient has already exhausted his benefits under the plan.[63]

The fifth and final example of a limitation that the defendants contend might be applicable to the instant case is that "the requirement . . . that any eligible individual be allowed to obtain medical care from any qualified provider of such service . . . should not be construed as obligating the agency to provide transportation beyond reasonable measures".[64] The immediately following sentence—unexcerpted by defendants—provides the meaning as to the test of "reasonableness": "Transportation need only be available to get individuals to *qualified providers* of their choice who are *generally available and used by other residents of the community*."[65] (emphasis added). Clearly, the guidelines are discussing "reasonable measures" in terms of "qualified providers" who are characterized as being "generally available and used by other residents of the community." That the named plaintiff's doctors are "generally available and used by other members of the community" as well as being "qualified providers" is undisputed.

Finally, the State of Texas advances the preposterous argument that its only

agency to provide transportation beyond reasonable measures. (p. 8)" Defendant's brief at 7.

56. MSA–PRG–17 at 3; *supra* at 7–8 and 23.

57. *Supra* at 21.

58. MSA–PRG–17 at 3.

59. *Id.*

60. *Supra* at 21.

61. MSA–PRG–17 at 3.

62. Stipulations 2, 4, 6–8, 13, 18, 27 and 40.

63. MSA–PRG–17 at 7.

64. *Id.*

65. *Id.*

obligation under the regulation is merely a rhetorical one—that it only has to formulate a plan but not really to put it into effect:

> "The regulation requires *only* that the State plan make 'provision for assuring' necessary medical transportation. Had the regulatory intent been to require the states to provide transportation, the regulation could simply have stated that the state was required to provide or pay for such transportation."[66] (author's emphasis).

The answer to that argument can be found in simple logic, for if such a program were to prevail, the entire structure of the Federally mandated Social Security program as explicated by law and statute would become nugatory and void—a fiscal bauble to be toyed with by the States at their whim and with the total absence of effective administrative controls from Washington. The States could either spend too much or too little —as in the instant case—and be answerable to no one. We hold that the answer to this proposition can be found in the statute itself and in prior decisions of the courts of this Country.

To begin with, the statute, 42 U.S.C. A., *supra*, in its very first sentence at § 1396a(a)(1) states that the Act *"shall be in effect"* (emphasis added) "in all political subdivisions of the State, and, if administered by them, be mandatory upon them . . ." This Court cannot conceive of any other meaning for "be in effect" than its plain meaning that it shall be in existence, operational and functioning. And, this definition is supported by both the applicable legal authorities, 28 C.J.S. 37.1 "Effect," Supp. at 835–836: "In effect means in operation" and 21 Words and Phrases at 514–515, " 'In effect' means to be 'in operation' " [citation omitted], and by the dictionary definition as "REALITY, FACT—now used only in the phrase 'in effect'," Webster's Third International Dictionary (1967).

We believe the State's interpretation here to be a perversion of the Congressional intent clearly contrary to the "overriding purpose" of the Act, Pleasant v. Richardson, *supra*. In this regard, we believe it to be essential to the proper interpretation of the Social Security Act to employ a natural reading which produces a harmonious result consistent with its legislative history and its remedial character. Rowe v. Finch, 427 F.2d 417 (4th Cir.) (1970); cf. Brown v. Barrett, *supra*; Ewing v. Black, *supra*. The approach here advocated by the defendants would simply make a mockery of the Social Security Act and would lead to administrative chaos.

## IV. THE TEXAS STATE PLAN

With this framework in mind as to the legislative and regulative requirements and the applicable principles of judicial construction, we shall now turn to the decisive question of this case which is the compliance or non-compliance of the State Plan of Texas with the transportation requirement of 45 C.F.R., *supra*.

We shall first cite the relevant portions of the State Plan as contained in the State's Medical Care Manual of Services and then, we shall examine the actual application of the plan particularly with reference to the named plaintiff.

Section 2310.9 of the Texas Department of Public Welfare's Medical Care Manual of Services reads as follows in pertinent part:

> "2310.9 *Certain Ambulance Services*
>
> "Payment will be made for ambulance service when (1) the service is required by the patient's condition and (2) the patient is transported to the nearest hospital with appropriate facilities (or to one in the same locality), from one hospital to another, to the patient's home (or place of residence), to an extended care facility, or to a hospital where he had formerly

66. Defendants' Trial Brief at 6.

been treated, and (3) the transportation is medically necessary and not merely for the convenience of the patient."[67]

This is cited to by reference in the State Plan for Medical Assistance Under:

"IV. *Medical Assistance* (D–5000)
A. *Amount, Duration, and Scope of Assistance* (D–5000)
1.a. (11) Ambulance Services"

The above comprise the entire text [67a] of the Texas welfare regulations as they pertain to medically necessary transportation and are embodied in the State Plan. Thus, it is clear that the above ambulance provision is the *only* provision in the entire State Plan for medical transportation.

■ It is therefore entirely obvious to this Court that the Texas State Plan both on its face for the reasons discussed, *infra,* and as construed and implemented by the defendants, *infra,* falls far short of the requirements set forth in 45 C.F.R. *supra* and by the Medical Assistance Manual, "Program Regulation Guide" *supra,* for in practice, the application of the statute is even more limited than it appears on its face.

Firstly, the provision is limited solely to ambulance service.[67b] Such a limitation totally excludes other forms of transportation that could easily be more accessible, economical, and efficient than ambulance service which is, as we have seen, *supra,* exceedingly costly and may also in certain instances represent an unnecessary under-utilization of specialized medical resources. For example, it has been suggested in HEW's Medical Assistance Manual guidelines, *supra,* and advanced in court by the plaintiffs that trucks or vans with hydraulic lifts could be utilized to transport the named plaintiff. Such a practice would further the twin goals of both affording the named plaintiff, for example, the particular kind of medical transportation that he requires (he must have means of transportation that will allow him to remain in his wheelchair) [68] and also minimizing the costs involved to the State. Moreover, as stated above, using appropriately fitted trucks or vans or the like would also "free up" ambulances for situations where their own specialized resources would be most effectively utilized and needed.

The second condition of the ambulance provisions further limits its application

---

67. The State of Texas has contracted with Blue Cross to provide ambulance service which contract reads as follows in pertinent part:
"Article IV—AUTHORIZED BENEFITS AND EXCLUSIONS AND LIMITATIONS
"A. AUTHORIZED BENEFITS
"7. *Ambulance Services*
"a. To be covered, ambulance service must be medically necessary and reasonable. Medical necessity is established when the recipient's condition is such that use of any other method of transportation is contraindicated. In any case in which some means of transportation other than ambulance could be utilized without endangering the recipient's health, no payment may be made for ambulance service."

67a. Defendants contend that the State Plan may be saved by reference to other provisions in the state welfare code. See Defendants' Trial Brief at 9 and 10. We reject this contention for the reasons set forth *infra.*

67b. The Blue Cross contract cited above, n. 67, speaks of "some means of transportation other than ambulance" in those situations where the same could be used without endangering the recipient's health." The record is clear that the named plaintiff, for one, does not necessarily need an ambulance —only some means of transportation that allows him to remain in his wheelchair without being lifted in and out bodily; however, the record is also clear and the point is undisputed that the State of Texas has made no effort so to provide the named plaintiff with such other means (at best, the record shows that State's agents merely tried to "plan" with *volunteer* agencies with sporadic success to utilize the volunteer groups' resources.) The State both at trial and in the written record has also made no mention of the proffer of its own resources in this regard in the case of the named plaintiff or of any other needy welfare recipient.

68. *See, supra* at 5.

only to those situations where the recipient is "transported to the nearest hospital or skilled nursing facility . . ." Such a limiting clause would—and does—deprive a needy individual of needed medical treatment that would be administered at facilities other than those enumerated, for as the defendants expressly admit in their Trial Brief: "Ambulance transportation . . . to a hospital's outpatient department, a private clinic or a private doctor's office and the return trip is not covered or payable." [69] In other words, the State will only furnish ambulance transportation if the recipient is to be admitted (a) to a hospital and (b) as an in-patient at that hospital; but they will not take him home afterwards. The State's policy totally ignores the concept of remedial, supportive and preventive treatment for the chronically ill such as Benjamin Smith and is shortsighted in the extreme for those so chronically afflicted. Thus untreated, the minor medical problem becomes the major medical problem and, in the end, and with consummate irony, the individual who under Texas law did not initially qualify for transportation becomes, owing to those very policies, sick enough to qualify as an emergency case (*infra* at 33) to be transported by ambulance and to be admitted as a hospital in-patient. It is the worst kind of false economy.[69a]

In this case, we have evidence that with the denial of transportation that, at the least, the named plaintiff's "contractures" are accelerating; [69aa] that he is apparently coming down with increased urinary tract infections; [69b] that he is not being afforded the proper therapy; [69c] and we believe the Supreme Court's language in Memorial Hospital

v. Maricopa County [69d] earlier this year in a case also involving, *inter alia*, the health rights of indigents to be particularly appropriate:

"To allow a serious illness to go untreated until it requires emergency hospitalization is to subject the sufferer to the danger of a substantial and irrevocable deterioration in his health . . . The denial of medical care is all the more cruel in this context, falling as it does on indigents who are often without the means to obtain alternative treatment." [69e]

This Court thus holds that on its face the Texas State Plan as it contains the above-cited restrictions [69f] as to medically necessary transportation for indigents is in violation of the applicable Federal regulations, *supra* at 45 C.F.R. and the directive of promulgated guidelines, Medical Assistance Manual, "Program Regulation Guide," and MSA–PRG–17, *supra*, that "the important thing is that the methods described in the state plan show a commitment to assure that every eligible individual will have transportation necessary for access to any care provided under the plan . . . [and that] in some fashion, the state must now assure necessary transportation services to recipients of medical assistance." [69g]

These restrictions and the intrinsic limitations of the proffered ambulance service discussed above are also in further contravention of other sections of the statute and regulations which mandate that: Medical assistance be available in all political subdivisions, 42 U.S.C.A. § 1396a(a)(1); that medical assistance be furnished with reasonable promptness, *id.* at (8); that medical assistance be provided in the same amount

---

**69.** At 3 citing the Affidavit of Commissioner of Public Welfare, Defendant Raymond W. Vowell (at 3) and Stipulation 36.

**69a.** See in this regard the letter of Social Worker Pounders at 37, *infra*.

**69aa.** Exhibit II–B, *supra* to Plaintiffs' Complaint.

**69b.** Exhibit II–D, *supra*.

**69c.** Exhibit II–A and II–B, *supra*.

**69d.** 415 U.S. 250, 259, 94 S.Ct. 1076, 1083, 39 L.Ed.2d 306.

**69e.** *Id.* at 261, 94 S.Ct. at 1083.

**69f.** Texas DPW Medical Care Manual of Services, Section 2310.9 *supra*.

**69g.** MSA–PRG–17, *id.* at 2 and 3.

and scope to all eligible individuals, *id.* at (10); that medical assistance be provided in a manner consistent with the best interests of the recipient, *id.* at (19); and that it be available to eligible recipients from qualified providers of their choice, *id.* at (23).[69h]

Yet, the limitations of the written State Plan are compounded *in practice* by an even more restrictive policy that *only* furnishes ambulance service in "emergency" situations.[70] Although the scope of what constitutes an "emergency" is not crystal clear from the record, it is nonetheless clear from the deposition of the Defendant Zalaznick that essential transportation needs of individuals such as the named plaintiff are conclusively denied:

"Q Have you not, Mr. Zalaznick, made a statement to me on several occasions subsequent to the hearing that you interpreted the medical necessity as opposed to the mere convenience requirement there as being an emergency requirement, is that true?

"A Say that again.

"Q Did you tell me that you thought that third requirement limited the ambulance services to emergency situations?

"A To some extent, yes.

"Q You did tell me that was your belief, did you not?

"A Yes.

"Q And did you tell me that was the manner in which the department had been interpreting that regulation?

"A It is possible. I don't recall.

"Q Is that the manner in which the department interprets that particular regulation to the best of your knowledge?

"A Basically yes, I would say. That is one of the basics there." [70a]

The question of a similarly restricted state policy also was the subject matter of Buffington v. Venable, *supra,* arising from the policies of the Georgia State Medicaid plan and its welfare department with regard to implementation of 45 C.F.R., *supra.* In the *Buffington* case, ". . . the Georgia plan apparently had no single statement about provision of such transportation, but . . . did provide a transportation allowance [71] as part of the monthly budget and also provided ambulance service when necessary." [72] This was the extent of the plan. During the pendency of the litigation, presumably in response to the litigation and a notification of non-compliance from HEW,[73] Georgia amended its plan and the Court observed: "It would certainly seem that the State's amendment of the Medicaid Plan, which is now approved by HEW, is a tacit admission that the previous plan was out of compliance with the pertinent regulation." [74]

The shortcomings in practice of the present Texas State Plan are overwhelmingly displayed in the case of plaintiff Benjamin Smith. The defendants have so stipulated [74a] and have admitted at every stage of the pleadings [75]

---

**69h.** *See* also HEW *Amicus* at 1 and 2 and *supra* at 19.

**70.** Deposition of Saul Zalaznick at 25, lines 4–21.

**70a.** *Id.*

**71.** *See, infra.*

**72.** Buffington v. Venable, *supra* at 2.

**73.** It is not clear, however, from the face of the opinion whether the litigation or the notification of non-compliance first issued or whether they appeared simultaneously.

**74.** *Buffington, supra* at 4.

**74a.** Stipulations 35–36, 40–41.

**75.** *See* (a) "IV" and "V" of the Defendants' Answer (at 2):
"Defendant admits that the Department of Public Welfare has been unable to assure the availability of transportation to the Plaintiff [Smith]."
(b) "Reply to Plaintiffs' Request for Admissions" (at 2 No. 17:
"It is admitted that evidence was presented at the administrative hearing which demonstrated the medical necessity for some transportation to the plaintiff [Smith] . . . .;"

that they knowingly deny him transportation that is necessary for his medical condition. Their Trial Brief at 3 is an example, for it plainly concludes: "Thus, the Department [of Public Welfare] is unable to assure the availability of all medical transportation which this plaintiff [Benjamin Smith] *may need and has requested.*"[76] (emphasis added).

Moreover, a quick glance at the statistics involved shows that it has been stipulated (Stipulations No. 48–50) that named plaintiff requires medical transportation at least three (3) days a week or approximately 12–15 trips per month and yet, the Department's own records reveal that over the course of the past three years only four ambulance trips have been furnished to plaintiff Smith.

Where a man has been waiting over three years and is still waiting for adequate transportation that has been forthcoming on only four occasions, it would be difficult to find a more clear-cut case of the denial of medical assistance with "reasonable promptness," 42 U.S.C.A. § 1396a(a)(8), *supra* at 19 & 32, to an otherwise eligible individual. As Mr. Justice Rehnquist put it in Jefferson v. Hackney, 406 U.S. 535, 545, 92 S.Ct. 1724, 1731, 32 L.Ed.2d 285 (1970): "The statute was intended to prevent the States from denying benefits, even temporarily, to a person who has been found fully qualified for aid."

A further sense of the injury inflicted upon plaintiff Smith by the denial of medical transportation [76a] can be found by returning to the letter of his Doctor, Charles L. Simpson of the University of Texas Medical School and the Bexar County Hospital District:[77] "I have followed Ben [Smith] for five months in Neurosurgery and General Surgery Clinics. He appears to be well motivated and very interested in his occupational and physical therapy, but has a great deal of difficulty with transportation to and from the hospital for this therapy as well as transportation for clinic visits and emergency room visits when necessary. He presently has to pay for transportation from his very limited resources and due to his inability to attend therapy regularly his difficulty with contractures is accelerating rapidly. Medications alone purchased outside the hospital has [sic] amounted to one hundred dollars on one occasion due to his inability to come to Bexar County Hospital where a discount would be available." Dr. Simpson concludes: "I realize that Ben's rehabilitation potential is very limited, but his visits to physical therapy and occupational therapy are one of the few things that Ben looks forward to as potentially beneficial to him."

This letter was written on September 4, 1970 and one can only surmise at the pain and suffering alone incurred by the

(c) Affidavit of Defendant Raymond W. Vowell (at 5):
"Under the approved State Plan it is not possible for the State Department of Public Welfare to fulfill plaintiff Smith's every need for transportation. . . ;"
(d) Deposition of Defendant Saul Zalaznick (at 20, lines 11–13):
"A. In my opinion, it would appear to me that Mr. Smith requires transportation that would keep him in a wheel chair or allow him to remain in a wheel chair . . . ;"

"Q. You would also agree . . . that the transportation in this case is medically necessary?"
"A. . . . I would have to say yes." (Page 20, lines 24–25 and Page 21, line 6)

"Q. But the Department won't assure medically necessary transportation, will it?"
"A. Not to my knowledge." (Page 44, lines 6–8)
*See* also Zalaznick Deposition at Page 23, line 5 to page 27, line 2 inclusive and page 32, line 19 to page 33, line 6 inclusive.

76. Citing Stipulation No. 35 and Affidavit of Vowell, page 5, line 23. *See also* Defendants' Trial Brief, *id.* at 10: ". . . it has been stipulated that this department cannot assure him all the medical transportation which he needs and has requested."

76a. *Supra* at 32.

77. Exhibit II–B to Plaintiffs' Complaint; *supra* at 9.

"accelerating" of Benjamin Smith's "contractures" over nearly the past four years. Additionally, Dr. Simpson raises what this Court considers to be a particularly valid point—that the deprivation of medically necessary transportation is disadvantageous even to the state for it may very well be a kind of false economy that only results in the end in higher medical costs. In this regard, we also note the statement of University of Texas Medical School Medical Social Worker Gail Pounders that: ". . . Ben's case is complex and expensive, yet if he is untreated because of lack of transportation he then *ends up having to be hospitalized*. This is false economy and leads to a higher expenditure of tax funds." [78]

It is, therefore, clear beyond all peradventure of doubt that the Texas State Plan *in both form as well as in practice* is out of compliance with the applicable Federal regulations, 45 C.F.R., *supra* and the promulgated guidelines, Medical Assistance Manual, "Program Regulation Guide" MSA–PRG–17, *supra*. Nevertheless, the defendants urge upon the Court two additional points that we also find wholly inadequate in salvaging the glaring deficiencies of the State Plan.

 The State of Texas first argues that there are other parts of the State *welfare* plan not included in the instant *Medical Assistance* plan that would ensure proper compliance. The State in its Trial Brief [78a] cites (a) to the $25.00 per month received by the plaintiff as his "Personal Needs Allowance" which we have discussed above and (b) to the portions of the Social Services Handbook, Sections 5440(5), (6), and (8)(b) which call for the recipient's social worker "to plan with the client, family or other appropriate persons, as necessary, to assist the client in carrying out medical recommendations, including transportation . . . to plan for transportation to and from necessary health resources."

This approach simply does not comport with this Court's interpretation of 45 C.F.R., *supra* which reads: "*State Plan Requirements*: A State Plan for medical assistance under Title XIX of the Social Security Act must . . . specify that there will be provision for assuring necessary transportation . . . describe the methods that will be used." Nor does this approach comport with HEW's *Amicus* which states that "the HEW regulations at issue require that necessary transportation be provided as part of the plan." [79]

 This Court holds as a matter of law that the State Medical Assistance Plan under Title XIX must contain within its four corners: (a) a guarantee of necessary medical transportation for eligible welfare recipients and (b) a general description of the various methods to be used. We read the language of the instant regulation, 45 C.F.R., *supra,* as being clear and unambiguous in its command. Of course, we recognize as the "Program Regulation Guide" points out, the State does not have to "stipulate in advance" every possible mode of transportation since the situation will necessarily differ with each individual. Nevertheless, the command of the language is unmistakable—there must be some inclusive description of the primary modes of transportation that can reasonably be contemplated to be utilized.

Secondarily, even allowing, *arguendo*, for the inclusion of the plaintiff Smith's $25.00 monthly "Personal Needs Allowance," it is painfully obvious that the pitiful sum involved, *supra*, is totally inadequate for Benjamin Smith's needs—it won't even pay for *one* ambulance trip.

Such a practice would also appear to be of questionable legality as the "Program Regulation Guide" states that: "Inclusion of the cost of travel as an item in the money payment is feasible in some instances . . . [but] the money payment approach would not be

---

78. Exhibit II–G to complaint, *supra*.

78a. *Supra* at 9.

79. HEW *Amicus, supra* at 3.

applicable to the medically needy or to categorically needy not receiving money payments." and that "the inclusion of travel in the money payment . . . would not be suitable, however, if money grants are subject to maximums or percentage reductions"[80] as they apparently are in Texas. HEW in its *Amicus* also expresses doubts about this practice: "If only a percentage of such necessary transportation costs would be covered by an increase in the cash grant this would not comply with the regulatory requirement."[81] (citing to the "Program Regulation Guide," *supra.*)

One can also only wonder as well at the situation of someone as the named plaintiff who, presumably, in addition to paying for the transportation would also have to be responsible personally for making the arrangements with the transportation providers, making telephone calls, answering mail, paying the bills, filling out—and obtaining money orders, stamps, checks, envelopes, etc. Benjamin Smith, it is stipulated, can perform none of the "normal" functions of life, can, apparently, barely sit up, has difficulty with speech—yet such an arrangement expects him to assume the administrative—as well as fiscal—burdens of arranging for his own transportation. This, in the Court's opinion is neither therapeutic, practical, nor legal.

Furthermore, one of the lessons of this entire case is of the fruitlessness of mere "planning" without any resources to follow through with the "plans" formulated.[82] The State urges us to consider a social worker vaguely "planning" without any means, money, or power to implement such plans as somehow rendering compliance within the Federal mandate—and also effectively helping her client. It has been demonstrated

both hypothetically and, in practice, in plaintiff Smith's case[83] that such a course is practically useless when confronted with the harsh realities dictated by the conditions of persons such as plaintiff Smith, for Benjamin Smith does not need more "planning," he needs a ride.

The defendants also allege that there has been some kind of HEW approval of their State Plan in this regard. Such an assertion could not be more wrong—or misleading. They write that HEW has "approved the state plan and has not subsequently held the state out of conformity on this issue."[84]

It is uncontested that prior to the promulgation of the instant regulation in 1970,[35] HEW *in 1967* had approved the Texas State Medical Assistance Plan and that subsequently the State Plan had not been formally held out of compliance. Nevertheless, there seems to be little doubt that the Texas Plan's provision only for ambulance service as the medical transportation caused some raised eyebrows at HEW from the very beginning as evidenced by the HEW *Amicus* and the attached correspondence[86] and that HEW's seeming "approval" was illusory at best:

"On September 16, 1970, HEW'S Dallas regional office wrote to the Commissioner of the Texas Department of Public Welfare noting the existence of the new mandatory transportation requirement and inquiring how the State of Texas proposed to comply therewith. On October 7, the Commissioner responded by letter,[86] noting the existence of Section 4(A)(11) of the Texas State Medicaid plan, dated August 8, 1967, which provided for ambulance services pursuant to Blue Cross Contract No. 21365, Article

80. "Program Regulation Guide," *supra* at 6.

81. HEW *Amicus, supra* at 3, n. 4.

82. *See, e. g.* Affidavit of Zalaznick at 19, lines 1–16 ". . . the [social] worker had attempted [to obtain transportation] and exhausted his knowledge of the resources . . ." *See* also, *infra*, at 8.

83. *See, e. g.* Stipulations 32–34.

84. Defendants' Trial Brief at 7.

85. Effective date, July 1, 1970.

86. Attached as Appendix I to the *Amicus.*

IV–A 7.3. The Texas Welfare Commissioner further stated that in instances where this provision would be inadequate, the State would adjust the recipient's standard of need so as to supply cash grants for additional transportation. *It does not appear that this commitment was ever incorporated in the Texas State Medicaid plan.* Nor is it certain whether this undertaking would have been found to satisfy all the requirements of 45 C. F.R. § 249.10(a)(5) had the State attempted to so amend its Medicaid plan in a formal fashion.[4] HEW's records

"4. The HEW regulations at issue require that necessary transportation be provided as part of the plan. If only a percentage of such necessary transportation costs would be covered by an increase in the cash grant this would not comply with the regulatory requirement. *See,* HEW Program Regulation Guide 17, para. C. (Attached as Exhibit C, hereinafter cited as PRG–17.)" (emphasis added).

do not reflect that any subsequent correspondence on this matter was conducted following HEW's receipt of the State's October 7 letter.[5]" (emphasis added).

"5. In light of the foregoing discussion, *it may be necessary for HEW to give further consideration to the conformity of the existing Texas Medicaid Plan provision with 45 C.F.R. § 249.10(a)(5).*" (emphasis added).

■ Absent even this posture of the case, however, the Court does not find necessarily compelling the argument that since HEW granted approval to a State Plan in 1967 that said approval automatically attached to the expression of all HEW subsequently required State Plan amendments and additions. The Federal government is sometimes slow —witness the case at bar—to follow through with the enforcement of its own regulations in this area and it would be a grave mistake for a Court to close its

eyes to the mistake of equating bureaucratic inaction with actual approval. At the least, in such a situation judicial review of challenges to the state plan is certainly not precluded. *See* Triplett v. Cobb, 331 F.Supp. 652, 660 (N.D.Miss.) (1971) [87] and Banner v. Smolenski, 315 F.Supp. 1076 (D.C.Mass.) (1970).

## IV. RETROACTIVE BENEFITS

The question of the retroactivity of benefits as urged by the plaintiffs has been fully disposed of by the recent Supreme Court decision [88] in Edelman v. Jordan, 416 U.S. 1000, 94 S.Ct. 1347, 39 L.Ed.2d 662, holding that the Eleventh Amendment is a conclusive bar to the award of retroactive benefits such as those sought in the instant case.

■ What has been said above is sufficient to a full disposition of the case. However, the Court feels that, since this is probably a case of first impression and there undoubtedly will be an appeal, it is incumbent upon the Court to address itself to all of the legal problems which were raised in the course of the hearings. The Court will therefore touch upon the other claims made which the Court does not feel are at all dispositive of the case and decisions which are not necessary for a complete resolution of the case.

## V. ADMINISTRATIVE HEARING PROCEDURES

■ As noted, *supra,* plaintiff Benjamin Smith appealed the denial of transportation and the said appeal was dismissed for being out of time. The named plaintiff has thus sought declaratory relief that the dismissal violated his right to due process under the Fourteenth Amendment as enunciated in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); [88a] violated

87. The Court in *Triplett, supra* even held that it "does not agree" that "the exchange of correspondence between Mississippi and HEW officials and the approval of the plan by HEW acts to deprive plaintiffs of the right to contest the validity of the regulation."

88. Decided March 25, 1974.

88a. However, it is well-settled law that the Court should decline to adjudicate the Constitutional claim in a matter if the case can be decided on statutory grounds instead, Townsend v. Swank, 404 U.S. 282, 291, 92

the applicable provisions of the Social Security Act itself; [88b] the regulations promulgated under the Act; [89] and the welfare provisions of the State of Texas.[90] Injunctive relief is further sought on behalf of the purported class. We hold that according to well-established rules relating to the granting of declaratory relief that neither the declaratory relief nor the injunctive relief can be granted.

■ At the keystone of declaratory relief is the Constitutional and statutory command that it be utilized only in actual cases and controversies. Article II, Section 2, United States Constitution; 28 U.S.C.A. § 2201.[91] In Maryland Casualty Co v. Pacific Coal and Oil Co., 312 U.S. 270 at 273, 61 S.Ct. 510, at 512, 85 L.Ed. 826 (1937), Mr. Justice Murphy

formulated the test for determining the appropriateness of declaratory relief as follows:

"Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."

Yet, we find for the reasons discussed, *infra*, that there is a substantial question as to the "reality" of the controversy in this aspect of the case thus, *inter alia*, rendering it inapplicable for the issuance of declaratory relief.

■ It is also well-settled law that declaratory relief rests in the sound discretion of the Court, 10 Wright and

S.Ct. 502, 30 L.Ed.2d 448 (1971); Rosado v. Wyman, 397 U.S. 397, 402, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1969); King v. Smith, 392 U.S. 309, 313, 333–334, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1967); Silvey v. Roberts, 363 F.Supp. 1006, 1012 (M.D.Fla.) (1973), and it is thus doubtful whether we would have reached plaintiff's 14th Amendment claim. We are also not unaware of the question which we also do not reach—as to whether the named plaintiff might be considered a "reducee" or "terminee," Daniel v. Goliday, 398 U.S. 73, 90 S.Ct. 1722, 26 L.Ed.2d 57 (1970), in the denial of benefits so as to take the Constitutional claim out of the ambit of Goldberg, *supra*, or, *contra*, whether the denial falls into the possible "brutal need" exception to *Goliday*, see Velazco v. Minter, 481 F.2d 573, 576–577 (1st Cir.) (1973); Silvey v. Roberts, *supra*.

88b. 42 U.S.C.A. § 1396a(a)(3).
"(a) A State plan for medical assistance must—
"(3) provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied . . . ."

89. 45 C.F.R. § 205.10(a)(3) and (a)(5) as follows:
"(a) *State Plan Requirements.* A State Plan . . . shall provide for a system of hearings under which:
"(5) An opportunity for a hearing shall be granted to any applicant who requests a hearing because his claim for . . . medical assistance is denied . . . and to any recipient who is aggrieved by any

agency action resulting in suspension, reduction, discontinuance or termination of assistance."
*See also* 45 C.F.R. *supra* at (a)(6)–(19) inclusive.

90. Texas Medical Assistance Act of 1967, Vernon's Tex.Rev.Civ.Stat.Ann. art. 695j–1, Sec. 9 and Department of Public Welfare, Administrative Procedures Handbook, Section 1212 as follows:
"*1212 Time for Filing a Request for Fair Hearing*
"The Appellant has a right to file his appeal within a reasonable time when he feels that proper consideration has not been given to all circumstances surrounding his case. *Sixty (60) days from the effective date of the decision is deemed a reasonable notice and time in which to appeal.* (No retroactive payment can be issued where more than sixty (60) days have elapsed between effective date of decision being appealed and date of appeal request.)" (Exhibit 2 to Deposition of Saul Zalaznick, incorporated by reference in Stipulation No. 52).

91. 28 U.S.C.A. § 2201. Creation of Remedy:
"In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration . . . ."
*See also* Chief Justice Hughes' landmark opinion in Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240–241, 57 S.Ct. 461, 81 L.Ed. 617 (1937).

Miller, Federal Practice and Procedure § 2759 at 784; Provident Tradesman Bank and Trust Co. v. Patterson, 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968), and is an alternative or cumulative remedy. 6A Moore Federal Practice ¶ 57.01(2). The authorities are also unanimous in the judgment as expressed by Professor Borchard that:

> "The two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceeding." [92]

See, e. g., Section 6, Uniform Declaratory Judgment Act; 6A Moore, supra at id., (5) and ¶ 57.08; Wright and Miller, supra at 773–774, 785; Hart and Wechsler, Federal Courts and Federal Court System, (2nd Ed.) at 133.

 Additionally, the authorities stress that the court should "refrain from giving a declaration unless there is a full-bodied record . . . "Wright and Miller, supra § 2759 at 789 citing Public Affairs Associates, Inc. v. Rickover, 369 U.S. 111, 82 S.Ct. 580, 7 L.Ed. 2d 604 (1962) and Fair v. Dekle, 367 F. 2d 377, 378, cert. den., 386 U.S. 996, 87 S.Ct. 1316, 18 L.Ed.2d 344 (5th Cir.) (1966). Unfortunately, the "full bodied record" in this aspect of the case is extraordinarily unclear as to the basic facts. The plaintiff argues that since he has suffered a "continuing denial" of

his transportation need, the statutory bar for being out of time as to the filing of his administrative appeal violates the above-mentioned Federal and state laws, 45 C.F.R. supra and the Texas Medical Assistance Act "Handbook," supra.

The defendants, on the other hand, simply negate the existence of a "controversy" at all by asserting that the statutory bar as so construed by the plaintiff does not exist. They urge that the situation arose out of misunderstanding and that the Appeals Analyst, Defendant Zalaznick, who dismissed the named plaintiff's appeal, was not aware that the named plaintiff's "continuing" need had resulted in a request for transportation within the proper time period—and that, therefore, the named plaintiff could, in fact, have successfully filed a re-appeal if he so desired [93] (which, in reality, seems unlikely, since, given the State's announced stance, he knew it was fore-ordained to failure, see infra) and the re-appeal would "not be thrown out or dismissed, because of an excess of 60 days." [94] The named plaintiff appears, if anything, to concede this point, for it is not even commented upon—let alone contravened—in his pleadings.

At any rate, the whole factual posture of this part of the case remains shrouded in ambiguity. Moreover, the whole question of the administrative appeal is clearly only subsidiary to the real issue in this case which is the State Plan and the real resolution which the parties seek—which is whether the State Plan conforms to Federal law. And assuming, arguendo, that the prayed-for de-

---

92. Borchard, Declaratory Judgments (2nd Ed.) (1941) at 299.

93. See, e. g.
"Although he [Defendant Zalaznick] 'assumed' that Plaintiff had requested transportation subsequent to October, Defendant Zalaznick indicated that the record before him did not indicate such requests (citing to Zalaznick deposition) since he felt that the appeal was based solely on the October 27 incident, he decided that it had not been timely filed because more than 60 days had elapsed between the oc-

currence of the incident and filing of the appeal. (Deposition of Saul Zalaznick, p. 29, lines 17–20). Plaintiff's allegation that Defendant Zalaznick's ruling has the effect of denying him forever the right to appeal is obviously the result of a misunderstanding regarding the ruling. Defendant Zalaznick himself has stated that another appeal based on a different, more recent event would be heard on the merits. Defendant's trial brief at 12 and 13.

94. Zalaznick deposition, supra, at page 35, line 7.

claratory relief were granted it would be an empty gesture, for under the old State Plan, the plaintiff still would not have obtained the transportation he needs, Stipulation 47,[95] yet "The test [is] whether the issuance of a declaratory judgment will effectively solve the problem . . ." 10 Wright and Miller, *supra*, § 2758 at 774 citing Western v. McGehee, 202 F.Supp. 287, 294 (D.C. Md.) (1962).

There is then little doubt in this Court's mind that this aspect of the case fails all the above tests [96] for the issuance of declaratory relief: (a) there is considerable doubt as to whether a "substantial controversy" exists of "sufficient immediacy and reality"; (b) we lack a "full-bodied record"; (c) it is questionable whether the requested-for relief would "terminate the uncertainty or controversy giving rise to the proceeding"; Borchard, *id.*, Hart and Wechsler, *id.*; and (d) the Court may properly, in its discretion, refuse such declaratory relief "if the alternative remedy is better or more effective," 10 Wright and Miller, *supra* § 2758 at 771, and here, clearly, the alternative remedy which we shall grant of holding the State Plan out of compliance is both superior and more truly dispositive of the real issues in this litigation. *A fortiori*, the prayed-for injunctive relief is also denied; and we also do not find it necessary to reach the issue of the class in this regard.

## CONCLUSION

Accordingly, we hold that as to the transportation component the Texas State Medical Plan is out of conformity with the applicable HEW regulations, 45 C.F.R. *supra* and is therefore invalid under the Supremacy Clause. Townsend v. Swank, *supra*, King v. Smith, *supra*. The State of Texas is hereby ordered to commence the transportation of the named plaintiff Benjamin Smith to and from the necessary medical providers within 30 days of the entry of this opinion; members of the class within 60 days; the State of Texas is also ordered to formulate within 120 days of the entry of this opinion a State Plan for Medical Assistance with regard to medical transportation in conformity with this opinion and 45 C.F.R. *supra*. Retroactive benefits will be denied. The prayed for declaratory and injunctive relief as to the dismissal of the administrative appeal will be denied. The above-ordered plan will be submitted to the Secretary of Health, Education and Welfare for approval and the Court will retain jurisdiction to ensure compliance with its Orders.

---

95. "A hearing officer's authority is limited to benefits which are covered in the State's plan and policy material; i. e., a hearing officer cannot authorize benefit which the Department has not adopted for purposes of payment." Stipulation 47.
*See also* Defendant's Trial Brief, *supra* at 14 ". . . defendant Zalaznick could not have authorized such benefits" under the existing State Plan.

96. Nevertheless, the denial of relief as to this particular area is not to intimate in any way the lack of merit in such a claim, for it appears to this Court that had the proper record been made, it would certainly seem to be a questionable practice in light of Federal law to erect the bar of a Statute of Limitations as against a welfare recipient who is in the situation of a "continuing need" and a coresponding "continuing denial."

## APPENDIX I

### STATE DEPARTMENT OF PUBLIC WELFARE
### ITINERARY

Benjamin Smith MONTH OF _____ May _____

| MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY |
|---|---|---|---|---|
| Urologist Oak Hill Bldg. | R. B. G. Physical Therapy | | R. B. G. Physical Therapy | |
| | R. B. G. Physical Therapy | R. B. G. Gastro Clinic | R. B. G. 1. Physical Therapy 2. ENT Clinic | |
| Urologist Oak Hill Bldg. | R. B. G. Physical Therapy | | R. B. G. Physical Therapy | |
| | R. B. G. Physical Therapy | R. B. G. Gastro Clinic | R. B. G. 1. Physical Therapy 2. ENT Clinic | |
| Urologist Oak Hill Medical Bldg. | R. B. G. Physical Therapy | | R. B. G. Physical Therapy | |

Hand clinic Wednesday AM—every three months—next appointment 7–12–72

Adult Neurology clinic Tuesday AM—every three months—next appointment 6–27–72