Carolyn MORGAN, et al.

v.

Walter W. COHEN, et al.

Civ. A. No. 85-3411.

United States District Court,
E.D. Pennsylvania.

June 24, 1987.

David A. Super, Philadelphia, Pa.

John O.J. Shellenberger, Philadelphia, Pa., for Com. of Pennsylvania.

MEMORANDUM AND ORDER

FULLAM, Chief Judge.

This is a class action. Plaintiffs are Pennsylvania residents eligible to attend psychiatric partial hospitalization services subsidized by the medical assistance (Medicaid) program under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*[1] Defendants are Pennsylvania Department of Public Welfare (DPW) officials who run the Medicaid program in this Commonwealth. Plaintiffs challenge proposed modifications to, and past implementation of, defendants' plan that regulates Medicaid transportation services. I will grant equitable relief based on the following findings of fact and conclusions of law.

## I.

A moderate to severe mental illness afflicts each plaintiff who, to attend a psychiatric partial hospitalization service, under 55 Pa.Code § 1153.52(b)(1), must:

(i) Have a mental disorder diagnosis that has been verified by a psychiatrist.

(ii) Have a psychiatric condition requiring more intensive treatment than that provided by an outpatient clinic.

(iii) Have a psychiatric condition requiring provision of a supervised, protective setting for a prescribed time period to prevent institutionalization or ease the transition from inpatient care to more independent living.

With such conditions, psychiatric partial hospitalization service patients are too sick to be treated in short, infrequent visits to therapists, but need not be kept in state mental hospitals.

Many such people have, however, at times been inpatients at state mental hospitals. Adults and children manifest diverse symptoms and may suffer additional handicaps, including mental retardation or physical disability.

All told, about 20,000 patients at any given time attend psychiatric partial hospitalization services. These services aim to increase patients' ability to function in society, to bring them back to and keep them in their community using the least restrictive therapy. 55 Pa.Code § 5210.6. Available therapy differs at different services, because certain providers specialize; for example, some fill particular needs for children or adults or the elderly, persons suffering acute crises or chronic illnesses or mental retardation, or the physically disabled or drug abusers. Such specializations can facilitate therapy, because otherwise tensions between subpopulations— such as the acutely and chronically ill or the young and old—may disturb patients and distract providers from their primary tasks and because specialization allows providers to implement particularly effective therapies.

The therapy at all services—described generally in 55 Pa.Code Chap. 1150, Appendix A, as limited by 55 Pa.Code § 1153.14— typically requires attendance at sessions three to five days per week. Each visit

---

1. Previously, plaintiffs' class was certified to include all Medicaid recipients "in Pennsylvania who are now, have been, or will be requiring and eligible for transportation to or from a medical assistance service." This broad class was not represented, neither by the named plaintiffs nor by the evidence presented. Accordingly, the class is recertified.

lasts between three and six hours. 55 Pa. Code § 1153.53(2).

These sessions may continue over a short or long time, depending on a patient's response. Success depends on both the total amount of time in therapy and the frequency of therapy.

If therapy is cut off (or cut down) prematurely, as the time without (or with reduced) treatment lengthens, patients become increasingly likely to harm themselves or others. For example, children may establish patterns of juvenile delinquency and adults may become homeless. Significant deterioration of mental health, including activation of psychoses, can occur within two weeks without treatment, leading to a need for increased drug therapy, emergency care, or institutionalization. Sometimes the lost capacity cannot be recovered when therapy resumes. Even to the extent that later treatment can re-establish patients' equilibrium, during the interim the patient and society suffer.

This cannot be avoided by increased use of inpatient or outpatient psychiatric services, the former being excessively restrictive for patients and expensive for society, the latter being ineffective. Psychiatric partial hospitalization services' inclusion within Pennsylvania's Medicaid program reflects awareness of the vital purposes fulfilled by this intermediate level of therapy.

The availability of psychiatric partial hospitalization services, and the regularity of therapy provided, significantly depend on patients' access to transportation. Transportation needs reflect patients' mental and physical condition, personal resources, and proximity to an appropriate service.

Many patients can walk, ride public transportation, drive or be driven to their services. Others—either because of confusion when beginning therapy or because they are experiencing an acute phase of mental illness, or because of disability, age, or great distance to travel—require paratransit, transport to a service by vans that may come with special equipment (such as wheelchair lifts) or with attendants.

Whatever their means of transportation, some psychiatric partial hospitalization therapy patients can pay the necessary costs using family money or medical insurance. Few such resources exist for plaintiffs, however, whose therapy is funded through the Medicaid program.

This program serves only poor people. See 42 U.S.C. § 1396a(a)(10 & 17). Their aid is paid for in part by the Commonwealth and, so long as the Commonwealth provides services in compliance with a plan approved by the Secretary of the United States Department of Health and Human Services (the Secretary), in part by the federal government. 42 U.S.C. § 1396. The relative share of costs depends on the type of service provided. 42 U.S.C. § 1396b(a). Medical services, under 42 U.S.C. § 1396b(a)(1), are more than half-paid-for by the federal government while administrative services, those "found necessary by the Secretary for the proper and efficient administration of the State plan" under 42 U.S.C. § 1396b(a)(7), are half-paid-for by the federal government.

In Pennsylvania, ambulance transport is provided as a medical service, but all other transportation is provided as an administrative service. See 55 Pa.Code § 1101.31. For many years DPW has paid for ambulance transport under 55 Pa.Code § 1245.51 et seq., but for other Medicaid transportation over the past few years DPW has changed reimbursement plans several times.

Before November 1983, under 55 Pa. Code § 175.23(b)(2)(ii) (superseded), DPW authorized cash grants to Medicaid recipients paying for necessary transportation, including transportation to psychiatric partial hospitalization services. Ultimately, this system proved too costly in DPW's view, providing little opportunity for either cost-containment or service coordination.

By November 1983, DPW replaced the old rules governing transportation with the Public Assistance Transportation Block Grant plan. This plan provided for DPW to offer each county, through the commissioners, a sum of money to pay for all Medicaid recipients to be carried to their health-care providers; in those counties re-

jecting the offer, DPW would offer non-governmental contractors the same deal; if neither county nor contractor accepted, DPW would reimburse Medicaid recipients as under the prior system. See 13 Pa.B. 2876–78 (September 24, 1983) and 55 Pa. Code Chap. 2070.

Under this Block Grant plan, the name notwithstanding, if counties or contractors exhausted their funds for transportation during a year then they could apply to DPW for a supplemental grant. This process was not well publicized, however, and with DPW's encouragement various county-based transporters placed improper limits on the time, frequency, area, and mode of transportation services provided. When supplemental grants were requested by the contractor in Philadelphia, DPW failed to provide funds in a timely manner so that several times this contractor almost ceased operations. Thus, disrupted or reduced transportation services under the Block Grant plan harmed certain plaintiffs.

Other plaintiffs, however, seem to have fared reasonably well under this system. The structure of county-based planning and coordination is praised by plaintiffs, who point out that under the Block Grant plan DPW's overall transportation outlays stopped escalating rapidly and, in spite of demand for psychiatric partial hospitalization services by recently de-institutionalized plaintiffs, held down (and probably cut) DPW's outlays for plaintiffs' transportation. Savings were augmented by DPW's commitment to audit one contractor, and additional savings probably would have been realized if DPW had made a reasonable commitment to monitoring and supervising other county-based transporters. This was not done, however. Instead, based on limited operating experience with respect to plaintiffs, DPW concluded that the Block Grant plan cost more than desired.

In May 1985, DPW decided to implement a new transportation plan called the Medical Assistance Transportation Program. The Transportation Program clarified that county-based transporters could obtain supplemental grants, but otherwise did not differ much from the Block Grant plan with respect to most Medicaid recipients. With respect to plaintiffs, however, the initial proposal would have required each service provider to assure round-trip transportation, in return for which the provider would receive $1.45 per plaintiff-hour of treatment in addition to the sums—$6.50 per child-hour and $5.50 per adult-hour—that previously had been paid for therapy sessions. This, for plaintiffs, constituted the first version of DPW's special transportation plan.

The terms were incorporated in agreements that DPW sent out in June for acceptance by psychiatric partial hospitalization service providers. The providers' old agreements were set to expire June 30, 1985.

Meanwhile, on June 1, 1985, plaintiffs commenced this litigation, the next day moving for a preliminary injunction against implementation of the special transportation plan. At a hearing on June 26, 1985, DPW announced a postponement of this special requirement for psychiatric partial hospitalization services. On June 27, 1985, plaintiffs' motion was denied without prejudice.

For the next three months, a choice was given to psychiatric partial hospitalization service providers. They could continue to provide therapy under their pre-existing agreements with DPW, with plaintiffs obtaining transportation as other Medicaid recipients under the Transportation Program. Alternatively, they could negotiate new provider agreements, providing therapy and assuring plaintiffs' transportation in return for the greater payment per plaintiff-hour of therapy. The choice was set to disappear on October 1, 1985, however, when DPW would have required all psychiatric partial hospitalization service providers to implement the special transportation plan.

This requirement was to have been authorized under an amendment to Pennsylvania's Medicaid plan. The plan's provision for "Methods Used to Assure Transportation of Recipients to and from Providers" would have been amended to add authoriza-

tion for "[t]he Commonwealth [to] *require* specific medical service providers, as a condition of participation in Medicaid, to assume the responsibility of assuring necessary transportation of recipients to and from the provider's place of service." (Emphasis added.) This proposed language was sent to the Secretary's regional office for approval in early September.

On September 16, 1985, plaintiffs again moved for preliminary injunctive relief against implementation of the special transportation plan. DPW responded by recognizing that problems would be caused by uniform, mandatory application of their proposal for plaintiffs' transportation, and by noting their consideration of options to amend the special transportation plan. The implications of these options were unclear, however, and after a hearing on September 30, 1985, plaintiffs' motion was granted. *Morgan v. Cohen,* [1986–1 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 35,082 (E.D.Pa.1985). Defendants were "enjoined ... from implementing or enforcing the terms of any Provider Agreement requiring the provider to assume responsibility for providing or assuring the transportation of patients...." This Order was amended on October 18, 1985, so as not to "preclude defendants from paying a higher medical assistance fee to partial hospitalization programs that were prepared to provide or assure transportation to their patients on October 1, 1985, and that do provide or assure transportation to their patients and that certify under oath or equivalent, that all decisions to provide or refuse treatment, and all decisions relative to the nature of treatment, are unaffected by factors relating to the patient's transportation requirements." These Orders reflected plaintiffs' demonstration of a great likelihood of success on the merits and plaintiffs' possible harm if the court forced another short-notice change in extant transportation plans.

During the next eight months, over 20% of the Commonwealth's licensed psychiatric partial hospitalization service providers declined to assure transportation and accepted the older, lower hourly fees. The rest took the newer, greater hourly fee and agreed to assure transportation.

Meanwhile, the Secretary's regional office considered DPW's proposal to require providers to assure transportation. In November 1985, the regional office responded to DPW's September letter, stating that the proposal could not be approved without further description of how it would ensure that providers in fact assured transportation required under federal law, of the mechanism to be used to require providers to take on this responsibility, of what guidelines providers would be given, and of related details. In February 1986, DPW responded. First, DPW noted that, after this court's Order, it had amended its proposal so that "[t]he Commonwealth may *offer* specific medical service providers ... the *option* of ... assuring transportation...." (Emphasis added.) Next, DPW vaguely stated that it would ensure the assurance of transportation as part of its general oversight of providers, that "[t]he incentive given [providers] to assume this responsibility may be a fee increase or some other benefit," and that the plan "incorporated ... the wording ... in federal regulations at 42 C.F.R. § 431.53 regarding assurance of transportation to make sure that federal guidelines are employed." This proposal, which nowhere outlines the final version of DPW's special transportation plan, described below, was approved by the Secretary's regional office on April 30, 1986.

On May 27 & 28, 1986, after a postponement at the parties' request, a final hearing was held. Assessing the voluminous record, the parties submitted proposed fact-findings and briefs totaling about 300 pages during July and August 1986.

In response to plaintiffs' evidence and arguments, DPW modified its proposal to govern transportation during the 1986–87 fiscal year and, as nothing further has been submitted, this will be taken as DPW's final proposed plan. The plan would require unexempted psychiatric partial hospitalization service providers to assure plaintiffs' round-trip transportation without allowing transportation costs to af-

fect treatment decisions, and in return for which the providers would obtain a $1.45 increase in payment per plaintiff-hour of therapy. Exempted providers would include those that, in an agreement with the surrounding county and subject to approval (subject to unspecified standards) by DPW's Secretary for Mental Health, "specialize" in services to children, the physically handicapped, or geriatric patients and those offering services where the average "distance all clients are transported to the program is 20 miles or more, where no public transportation is available [and] where no other partial hospitalization program is located closer to the patients...." At exempted services, the provider could decline the $1.45 per-hour increase in payment and avoid the obligation to assure transportation; in such cases plaintiffs would be transported in the same manner as other Medicaid recipients under the unchanged Transportation Program. Insofar as this distinguishes plaintiffs, it constitutes the final version of DPW's special transportation plan.

This sets the context for plaintiffs' two sets of claims. First, relying on provisions of Title XIX and federal regulations thereunder, the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 *et seq.*, and the United States Constitution, plaintiffs seek an order prohibiting DPW from implementing the special transportation plan. Second, relying on the same federal law, plaintiffs seek declaratory judgments that in certain respects DPW illegally has administered the Block Grant plan and the Transportation Program. Plaintiffs do not, however, challenge the basic framework of county-based coordination of transportation as embodied in the Transportation Program as adapted from the Block Grant plan.

## II.

All aspects of DPW's Medicaid plan "must comply with the requirements of Title XIX...." *Alexander v. Choate,* 469 U.S. 287, 289 n. 1, 105 S.Ct. 712, 715, n. 1, 83 L.Ed.2d 661 (1985); *Harris v. McRae,* 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980). These include a mandate that DPW "provide such safeguards

as may be necessary to assure that eligibility for care and services under the plan will be determined, and such care and services will be provided, in a manner consistent with simplicity of administration and the best interests of the recipients." 42 U.S.C. § 1396a(a)(19). This constitutes a limit on the "substantial discretion" accorded to DPW, *Alexander v. Choate,* 469 U.S. at 303, 105 S.Ct. at 722; at least it requires that changes effected by the special transportation plan not be "irrational or arbitrary and counterproductive to the medical well-being of all Medicaid recipients...." *Budnicki v. Beal,* 450 F.Supp. 546, 557 (E.D.Pa.1978). *Accord, Philadelphia Welfare Rights Organization v. O'Bannon,* 517 F.Supp. 501, 508 (E.D.Pa.1981), *aff'd mem.,* 681 F.2d 808 (3d Cir.1982); *Kessler v. Blum,* 591 F.Supp. 1013, 1029 (S.D.N.Y. 1984); *see also Jennings v. Alexander,* 715 F.2d 1036, 1045 (6th Cir.1983), *rev'd on other grounds,* 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). Thus, "when a state decides to distribute a service as part of its participation in Title XIX, its discretion to decide how the service shall be distributed, while broad, is not unfettered: the service must be distributed in a manner which bears a rational relationship to the underlying federal purpose of providing the service to those in greatest need of it." *White v. Beal,* 555 F.2d 1146, 1151 (3d Cir.1977); *see also Roe v. Casey,* 623 F.2d 829, 840 (3d Cir.1980) (Hunter, J., concurring). This rationality requirement entails analysis of how the special transportation plan affects plaintiffs and how it affects the Commonwealth.

### A.

The special transportation plan distinguishes two subclasses of plaintiffs, based on their attendance at either exempted or unexempted psychiatric partial hospitalization services. Members of both plaintiff subclasses would be affected adversely by the special transportation plan.

### 1.

The special transportation would prevent plaintiffs at exempted services from receiv-

ing therapy as good as that provided plaintiffs at unexempted services. For treatment of plaintiffs at exempted services, providers would receive no more than the basic payment of $6.50 per child-hour and $5.50 per adult-hour. For treatment of plaintiffs at unexempted services, providers on average would receive more money per hour of therapy. The inequality derives from the method by which DPW calculated the $1.45 per plaintiff-hour increment of payment.

The formula was simple. The estimated number of dollars to be spent on plaintiffs' transportation in 1984–85 was divided by the total hours of psychiatric partial hospitalization services estimated to be provided in 1985–86, to yield $1.45 per hour. This figure would have been somewhat greater if defendants had corrected certain methodological errors, such as their failure to include all transportation outlays, and if defendants had attempted to anticipate actual transportation costs for future years, which would have required some adjustment for inflation. To demonstrate the relative deprivation of plaintiffs attending exempted services, however, it suffices to recognize DPW's calculation of an average number of dollars spent on transportation per plaintiff-hour of therapy.

This average covers both plaintiffs whose transportation costs are great, expensive-to-transport plaintiffs such as those who require long-distance transportation and those who require van transport, and plaintiffs whose transportation costs are low, cheap-to-transport plaintiffs such as those who can walk, drive, or take public transportation. Expensive-to-transport plaintiffs would be present in above-average numbers at exempted services, those specializing in the treatment of patients whose conditions make transportation difficult, so the exempted services would, but for their exemption, experience above-average costs of transportation per plaintiff-hour of therapy. It follows that the unexempted services, as a group, would experience below-average costs of transportation per plaintiff-hour of therapy. Thus, if all providers were forced to assure plaintiffs' transportation in return for the average payment of $1.45 per plaintiff-hour of therapy, exempted services on average would lose money on transportation while unexempted services on average would make money on transportation.

Recognition of the exempted services' great exposure to losses under a mandatory system led DPW to change its initial proposal (from May 1985) and to allow exempted services to opt out of the transportation duty. Therefore, under the special transportation plan, exempted services can ensure that costs for transportation will not force their closure.

By preventing the extinction of exempted services, many of which offer important specialized therapies, plaintiffs have secured important relief. This relief, however, is not complete. Exempted services would need to provide therapy using only the basic fee, whereas on average unexempted services would have money both from the basic fee and from profits on transportation. The extra money available to unexempted services would benefit plaintiffs at unexempted services or, equivalently, would create a relative disadvantage for plaintiffs at exempted services.

Based on the evidence presented, the inequality cannot be quantified precisely. However, for each plaintiff who walks in to receive six hours of therapy at an unexempted service, the provider would gain $8.70 per day, and for each plaintiff who uses public transportation costing $1.70 round-trip to an unexempted service, the provider would gain $7.00 per day. Alternatively put, those who walk to unexempted services would be worth about 25% more to providers than those who walk to exempted services, and those who take buses would be worth about 20% more. The receipts from assuring transportation services would amount to a sizeable sum for many unexempted services, creating a sizeable systemwide disadvantage for plaintiffs attending (and providers of) exempted services (and would create some inequality among unexempted services, which vary in composition of patient population).

## 2.

The special transportation plan also would create perverse incentives affecting who receives therapy and what therapy is provided at unexempted psychiatric partial hospitalization services. Available services would be reduced and made less reliably accessible than under the Block Grant plan.

The perverse incentives, like the above-described inequality, derive from tying reimbursement for providers to an average of transportation costs per hour of therapy. If this average, $1.45, multiplied by a particular plaintiff's number of hours of therapy per day exceeds the daily round-trip transportation cost for that plaintiff, then the provider would gain a profit on transportation. If the daily round-trip transportation cost for a plaintiff exceeds the average multiplied by that plaintiff's number of hours of therapy per day, then the provider would incur a loss on transportation. Thus providers of unexempted services could improve their fiscal status by altering the number of hours per day of therapy provided to each plaintiff, by cutting or refusing to admit expensive-to-transport plaintiffs, or by adding or failing to discharge cheap-to-transport plaintiffs.

Unexempted services' incentive to alter the number of hours of therapy includes several components. For all plaintiffs except those whose transportation costs nothing, a provider's profits would improve by cutting the number of days on which therapy is provided and increasing the number of hours per day of therapy; given a choice between treating a plaintiff three hours per day, 240 days per year and six hours per day, 120 days per year, the latter option would give a provider more profit because it would halve that plaintiff's transportation costs. If a plaintiff is not receiving the maximum number of hours of psychiatric partial hospitalization each year, set at 720 hours by 55 Pa.Code § 1153.53(1), and if $8.70 exceeds the plaintiff's daily transportation cost, a provider would have extra incentive to increase the plaintiff's total number of hours of therapy. Thus, with respect to both the amount per year and per day of therapy, the special transporta-

tion plan would create an incentive for changes.

Such changes in response to this incentive have been anticipated, even encouraged, by DPW employees. The evidence of behavior under the Block Grant plan and Transportation Program confirms that, in setting schedules for their unexempted services under the special transportation plan, providers would take plaintiffs' transportation costs into account as a factor that would result in some plaintiffs receiving a reduced quality of care.

There would be harm to plaintiffs who do not need 720 hours per year of therapy and who, if forced to receive extra treatment, would be restricted needlessly. Similarly, harm would be suffered by plaintiffs best served by attending fewer than six hours of therapy per session. Most significantly, given the limit on total number of hours of therapy subsidized by the Medicaid program, increased time per session would cause reduced frequency of therapy, which would harm plaintiffs better served with more treatment days than with longer sessions per day.

Unexempted services' incentive to cut or to refuse to admit expensive-to-transport plaintiffs would arise when a plaintiff's round-trip transportation costs exceed $8.70. For ambulatory plaintiffs requiring van transport, round-trip costs would be at least $10 to $15, for nonambulatory plaintiffs the costs would be about twice as great, and costs would increase further if (due to a small scale of operations or other reason) a provider could not run on each trip a full van. Van transport often is required for the young, the old, and the disabled, and for other plaintiffs, too. For plaintiffs living far from their therapy centers, round-trip costs can average $20 to $30. Not all plaintiffs whose round-trip transportation costs over $8.70 would attend specialized services, so many providers would face incentives (which would grow with inflation) to keep expensive-to-transport plaintiffs from their unexempted services.

This could be done in several ways. Some patients could be excluded from ther-

apy, or the number of days on which they receive therapy could be reduced. Some patients could be rediagnosed and transferred to inpatient psychiatric services, and some could be rediagnosed and transferred to outpatient psychiatric services. Examples of such practices were found by plaintiffs while the preliminary injunction allowed providers to elect to assure transportation, and would be more common under the proposed plan where providers of unexempted services could not otherwise avoid paying for the transportation.

Those plaintiffs improperly cut from a service, losing time in therapy, or placed in an outpatient setting would be harmed by an insufficient amount of treatment. Those plaintiffs improperly placed as inpatients in psychiatric wards of state mental hospitals would be harmed by unduly restrictive treatment.

Unexempted services' incentive to add or to fail to discharge cheap-to-transport plaintiffs would arise because plaintiffs who can walk, take public transportation, or be driven to therapy could, if kept from inpatient or outpatient psychiatric services and given partial hospitalization, generate increased revenues to providers. There is a realistic probability of such behavior based on the evidence presented. Adverse impacts are obvious.

In short, problems would arise at unexempted psychiatric partial hospitalization services because the incentive for providers to maximize profits conflicts with the duty to diagnose and treat plaintiffs according to the plaintiffs' best interests, and because the profit or loss potential is great enough for some providers, some of the time, to ignore their oath not to let transportation costs affect medical decisions. These occurrences would be difficult to detect, because of the discretionary nature of diagnostic and treatment decisions, because plaintiffs as a class are among the people least likely to know and least likely to complain about when they are being done wrong, and because of the difficulties in monitoring this wide-ranging program. This makes DPW's system of case-by-case administrative review insufficient to protect plaintiffs.

Two other problems would, under the special transportation plan, face some plaintiffs attending unexempted services. First, although most unexempted services would make extra money because their patients would require below-average payments for transportation, some unexempted services would be forced out of business by substantial losses incurred in paying the round-trip costs of expensive-to-transport plaintiffs. Such plaintiffs might be reassigned to another service eventually, but this would take time, especially in counties that lack excess capacity to treat plaintiffs, and in the interim the plaintiffs would be without treatment. Interruptions also would be caused by the inexperience of, and lack of institutional support for and supervision of, administrators who would coordinate plaintiffs' transportation to the unexempted services. Although the administrators might learn to become skilled in the job, because providers would hire transportation on a smaller scale than the county-based transporters under the Block Grant plan, most providers would not be able to generate the efficiencies or to afford the back-up that could keep costs down and protect against interruptions. The magnitude of these problems cannot be assessed precisely, but it is fair to anticipate that some interruptions would last long enough to cause harms to plaintiffs and therefore also to society, harms which would be aggravated to the extent that DPW's special transportation plan (and unreliable past administrative practices) discourage the opening of new psychiatric partial hospitalization services.

In sum, although neither the identities nor the precise number of plaintiffs who would suffer under the special transportation plan can be determined, I find, in both subclasses, that significant numbers of plaintiffs would suffer relative or absolute deprivation under the proposed plan. This constitutes irreparable harm sufficient to justify equitable relief.

## B.

The special transportation plan was designed with several goals in mind. In part, DPW intended to reduce expenditures for plaintiffs' transportation. Also, DPW intended to simplify administration of the Medicaid transportation network and to promote development of local transportation networks for social services. These goals, however laudable, would not be fulfilled by the special transportation plan, which instead would make the Commonwealth's situation uniformly worse.

The special transportation plan builds in a guarantee of increased total costs for plaintiffs' transportation. Plaintiffs attending exempted psychiatric partial hospitalization services would be transported at DPW's expense as under the Block Grant plan. There is no reason to believe that, with respect to these plaintiffs, the special transportation plan would enable DPW to save money by comparison to prior years; there are many reasons, related to the decreased scale of county-based coordination of operations under the special transportation plan, to expect increased costs for DPW to transport this subclass of patients.

To transport the other subclass of plaintiffs, those attending unexempted services, DPW previously paid an average of less than $1.45 per hour of therapy. By paying $1.45 per hour of therapy in return for transportation, DPW guarantees that, even if unexempted services provide the same number of therapy hours as in past years, transportation expenditures would increase. In practice, for the reasons previously stated, unexempted service providers would increase the total time for plaintiffs' therapy—even if the actual amount of transportation decreases—causing further increases in expenditures to transport these plaintiffs. Given the increased expenditures on plaintiffs at unexempted services and the constant or increased expenditures on plaintiffs at exempted services, DPW could not avoid increasing its total expenditures for all plaintiffs' transportation.

These increases in DPW's expenditures might be offset, in part, if providers illegitimately cut expensive-to-transport plaintiffs from their psychiatric partial hospitalization services.[2] For each such denial of service, DPW could save up to $1044 ($1.45 per hour multiplied by 720 hours) per year. Any such "savings" would be more than offset, however, by increased expenditures on other programs—including emergency care, use of community residential rehabilitation centers instead of independent living arrangements or boarding homes to house plaintiffs, and inpatient psychiatric treatment—required to remedy plaintiffs' harms caused by illegitimate cutbacks.

Similarly, with respect to administration of the Medicaid transportation network, the special transportation plan would probably cause increased complexity and burdens. This follows from the special transportation plan's effect on DPW, the county-based transporters, and the unexempted service providers.

DPW's administrative requirements would increase or, at best, not decrease. Under the Block Grant plan, day-to-day administration of Medicaid transportation was done by DPW or, mostly, by the 60-plus counties and county-wide contractors supervised by DPW. DPW would continue to perform similar functions, notwithstanding the special transportation plan, because the Transportation Program would remain in place to assure transportation of Medicaid recipients other than plaintiffs and of plaintiffs attending exempted services. The exempted services would include many, probably most, of the expensive-to-transport plaintiffs and, these being the plaintiffs for whom transportation is most difficult to coordinate, DPW would need to maintain much, if not all, of its current administrative department even without considering DPW's administrative responsibility for unexempted services.

---

**2.** Savings from legitimate reclassifications cannot be counted. The special transportation plan neither has been nor could be defended as designed to combat providers' wrongful maintenance of expensive-to-transport plaintiffs at unexempted services.

The unexempted services would run transportation at about 200 sites. The providers' requests for reimbursement under the special transportation plan would, no doubt, be easier for DPW to process than were the plaintiffs' under the Block Grant plan, but DPW would need new administrative staff to monitor transportation practices at unexempted services. In sum, the special transportation plan would not significantly reduce DPW's administrative overhead.

Meanwhile, in each county a transporter would remain to administer the Transportation Program. The transporter's only administrative savings would result from not needing to assure transportation for plaintiffs attending unexempted psychiatric partial hospitalization services. These savings would be relatively small because many plaintiffs would travel to unexempted services by foot, bus, or car and therefore previously would not have required much administration. Such administration as was required would, under the special transportation plan, be conducted at unexempted services, each one of which thus would need to create a transportation assurance bureaucracy. These bureaucracies would face the daunting task of coordinating transportation independently on a small scale.

In short, any administrative savings realized by DPW or the county-based transporters would be insignificant by comparison to the additional administrative complexity engendered by creating numerous independent bureaucracies at unexempted psychiatric partial hospitalization services. By loosing so many independent, small bureaucracies while retaining the pre-existing overarching bureaucracies, the special transportation plan would cause administrative chaos. (Such chaos has let some providers, under the Transportation Program, place ineligible plaintiffs on free transportation systems and thereby defraud the Commonwealth.)

Similarly, the special transportation plan cannot be found to promote development of local transportation networks for social services. Under the Block Grant plan many county public transportation systems were administratively integrated with and adapted to the local Medicaid transportation network under terms negotiated between administrators of public transportation services and the single Block Grant plan transporter in each county. By setting up independent transportation coordinators at unexempted psychiatric partial hospitalization services, the special transportation plan would increase the number of bargaining agents, adding the several providers, and thereby make more difficult negotiations to integrate city or county-wide transportation networks.

Thus, defendants' articulated purposes are frustrated by their reliance on a proposal that ties transportation payments to hours of therapy and that creates numerous independent transportation coordinators. Moreover, such characteristics are neither necessary to involve providers and plaintiffs in the transportation mode selection and scheduling processes nor necessary to ensure attendance at, and incorporate mobility training into, plaintiffs' therapy. The special transportation plan would serve only to facilitate DPW's ability to ignore and minimize the importance of plaintiffs' transportation needs.

Absent this lawsuit, DPW's plan would have been to let each psychiatric partial hospitalization service provider independently coordinate its plaintiffs' transportation. That plan's failings were recognized in part by DPW when it created the exemptions, but DPW failed to recognize that the revisions left the special transportation plan devoid of benefits.

DPW argues that the special transportation plan's merit is demonstrated by the agreement of most psychiatric partial hospitalization service providers to accept the $1.45 extra per plaintiff-hour of therapy in return for the duty to assure transportation. In my view, however, the 80% acceptance rate merely suggests that many providers expect to reap a financial windfall under the special transportation plan—a benefit which translates into harms to plaintiffs and society.

■ The absence of benefits to the Commonwealth coupled with the anticipated irreparable harms make the special transportation plan irrational under 42 U.S.C. § 1396a(a)(19). Therefore, the special transportation plan cannot lawfully be implemented.[3]

### III.

DPW also must comply with the binding federal regulations promulgated to implement Title XIX. *Alexander v. Choate*, 469 U.S. at 289 n. 1, 105 S.Ct. at 715 n. 1. These require an adequate transportation plan, controlled by DPW, fully disclosed to the public.

### A.

The most important regulation is 42 C.F.R. § 431.53. It provides, with respect to all Medicaid services, that Pennsylvania's plan must

(a) Specify that [DPW] will assure necessary transportation for recipients to and from providers; and

(b) Describe the methods that will be used to meet this requirement.

This mandate is elaborated in the Secretary's Medical Assistance Manual, § 6–20–20, *reprinted in* 3 Medicare & Medicaid Guide (CCH) ¶ 14,605.89, at 6305.

In the Manual, the Secretary has recognized the need for assured transportation to implement several important requirements of Title XIX: making Medicaid available in all Pennsylvania's political subdivisions, reasonably promptly, without improper discrimination, in recipients' best interests, and from qualified providers chosen by recipients. *Id.* at 6305–06 (citing 42 U.S.C. § 1396a(a)(1, 8, 10, 19 & 23)). Moreover, the Secretary has found, "from past program operation experience, that unless needy individuals can actually get to and from providers of services, the entire goal

of a Medicaid program is inhibited at the start." *Id.* at 6306.

This accords with common sense and, following the line of reasoning in the Manual, Title XIX probably implies some right of transportation for plaintiffs. In any event, unassailable findings and reasoning justify § 431.53.

This regulation, which has existed in one form or another since the start of the Medicaid program and never has been questioned by Congress, has been enforced by the courts when appropriately invoked by Medicaid recipients. *See, e.g., Smith v. Vowell*, 379 F.Supp. 139 (W.D.Tex.), *aff'd*, 504 F.2d 759 (5th Cir.1974); *Fant v. Stumbo*, 552 F.Supp. 617 (W.D.Ky.1982); *Bingham v. Obledo*, 147 Cal.App.3d 401, 195 Cal.Rptr. 142 (1983); *Daniels v. Tennessee Dep't of Health & Environment*, [1985 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 34,562 (M.D.Tenn.1985); *see also Schreiner v. Hegstrom*, [1982 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 32,066 (D.Or.1982) (approving consent judgment that § 431.53 governs Oregon's Medicaid program). Similarly, in *Wright v. City of Roanoke Redevelopment and Housing Authority*, ―― U.S. ――, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987), at the behest of a benefits-program's recipients, the Supreme Court enforced rights defined in part by a statute and in part by a federal agency regulation.

■ Accordingly, I reject defendants' arguments that Title XIX does not require DPW to assure transportation, that § 431.53 is invalid, and that plaintiffs lack a private right of action. It remains to be determined what rights plaintiffs possess, rights that DPW promised to protect in its February 1986 letter to the Secretary. These will be discussed below, without attempting to be exhaustive, under the as-

---

**3.** This conclusion also would follow by application of 42 U.S.C. § 1396a(a)(30)(A). That statute requires that the proposed plan "provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary to safeguard against unnecessary uti-

lization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care[.]" *See also* 42 C.F.R. § 440.230(c) (forbidding arbitrary denial or reduction of certain services based on diagnosis, illness, or condition).

sumption that transportation is provided as an administrative service.[4]

As stated in the Manual, 3 Medicare & Medicaid Guide (CCH), at 6306, to satisfy § 431.53 "it is essential that the methods described in [DPW's] plan show a commitment to assure that every eligible individual will have transportation necessary to secure any medical care needed which is provided under [DPW's] Medicaid program." *See Smith*, 379 F.Supp. at 151; *Daniels*, [1985 Transfer Binder] Medicare & Medicaid Guide (CCH), at 9795. This obligation is not merely rhetorical; the plan must assure a successful transportation system in practical terms. *Smith*, 379 F.Supp. at 153–54. This goal has not yet been achieved by DPW's administration of the Block Grant plan and Transportation Program, because DPW has at times imposed arbitrary limits on the amount of money to be spent on transportation and has allowed county-based transporters to impose arbitrary limits on plaintiffs' access to transportation. Nor would transportation rationally be assured by the special transportation plan, as discussed, because not all plaintiffs would obtain equal opportunities for medical care and the expense of some plaintiffs' transportation would prevent them from obtaining proper medical care. Deciding what medical care is due each plaintiff should not be influenced by transportation costs.

Transportation costs affect how, not whether to assure transportation. For example, as elaborated in the Manual, 3 Medicare & Medicaid Guide (CCH), at 6308, DPW should expend no funds if volunteers will do the job, and in general should make payment only "for the least expensive means suitable to the recipient's medical needs." Ultimately, DPW must assure that "transportation is available only to get individuals to qualified providers of their choice who are generally available and used by other residents of the community." *Id.*

The regulation generally allows requiring plaintiffs to receive therapy in their home community when available there, but "[u]navailability of qualified participating providers requires transportation to sources outside the usual community boundaries," *id.* at 6309, and in this context DPW must give effect to plaintiffs' right, under 42 U.S.C. § 1396a(a)(23) and 42 C.F.R. § 431.51, to free choice among qualified providers. *Daniels*, [1985 Transfer Binder] Medicare & Medicaid Guide (CCH), at 9797–98; *see also Smith*, 379 F.Supp at 153. This right is important to plaintiffs, whose chances of treatment by compatible therapists depends on their ranges of choices of therapists. The ranges of choices are limited by access to transportation, which must be sufficient to give plaintiffs "an opportunity to obtain medical services from providers of their choice that is comparable, if not equal, to the opportunity available to persons who are financially independent." *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 786, 100 S.Ct. 2467, 2476, 65 L.Ed.2d 506 (1980). *See generally* Manual, §§ 5–100–10 to –20, *reprinted in* 3 Medicare & Medicaid Guide (CCH) ¶ 14,525.15 (guidelines for promoting free choice of provider).[5]

---

**4.** Transportation may be provided as a medical service, under 42 U.S.C. § 1396d(a)(21) as implemented by 42 C.F.R. § 440.170(a). The regulation notes that transportation as a medical service "is furnished only by a provider to whom a direct vendor payment can appropriately be made by the agency." 42 C.F.R. § 440.-170(a)(2). This class of providers includes those offering psychiatric partial hospitalization services, and it is possible that if DPW plans to pay such providers to transport their patients then the transportation would need to be treated as a medical service (or part of a medical service), which would affect the scope of plaintiffs' rights. This issue need not be reached now. In any event, DPW's ability to provide transportation as a medical service "*is distinct* from the

mandatory state plan administrative requirements to *assure* necessary transportation," Manual, 3 Medicare & Medicaid Guide (CCH), at 6306, and if some transportation is provided as a medical service, still DPW's "plan *must* include a description of methods to assure transportation *in addition* to the listing under the scope of medical services," *id.* at 6308. (Emphasis original.)

**5.** Closely related to plaintiffs' right of free choice is their right that, within appropriately-defined groups of Medicaid recipients, all individuals have services equally available. *See* 42 U.S.C. § 1396a(a)(10); 42 C.F.R. § 440.240(b). Availability of services might be made unequal

Generally, the Manual, 3 Medicare & Medicaid Guide (CCH), at 6309, properly recognizes that "transportation ... provided ... must be adequate for each individual's particular combination of physical limitations, geographic location, and available sources of medical care." *Daniels*, [1985 Transfer Binder] Medicare & Medicaid Guide (CCH), at 9799. Thus, although DPW must publish a plan to assure transportation, the details of each Medicaid recipient's transportation must be determined on a case-by-case basis. Manual, 3 Medicare & Medicaid Guide (CCH), at 6309. However, neither case-by-case evaluation nor any other excuse justifies interruptions of transportation for Medicaid recipients, which has occurred and which DPW concedes would occur under the special transportation plan. Under 42 U.S.C. § 1396a(a)(8) medical assistance must "be furnished with reasonable promptness to all eligible individuals," and these words mean, as now Chief Justice Rehnquist explained in *Jefferson v. Hackney*, 406 U.S. 535, 545, 92 S.Ct. 1724, 1730, 32 L.Ed.2d 285 (1972), that Title XIX "was intended to prevent the States from denying benefits, even temporarily, to a person who has been found fully qualified for aid." *Daniels*, [1985 Transfer Binder] Medicare & Medicaid Guide (CCH), at 9800.

### B.

In enacting Title XIX, Congress sought to minimize improper denials of benefits. Certain provisions were designed to ensure "that the States will not administer the provisions for services in a way which adversely affects the availability or the quality of the care to be provided," S.Rep. No. 404, 89th Cong., 1st Sess. (1965), *reprinted in* 1965 U.S.Code Cong. & Admin.News 1943, 2016–17, and 42 U.S.C. § 1396a(a)(5), requiring "the establishment or designation of a single State agency to administer or to supervise the administration of the plan" (with one exception not relevant here), was passed to ensure accountability for operations. *Hillburn v. Maher*, 795 F.2d 252, 261 (2d Cir.1986), *cert. denied*, —— U.S.

——, 107 S.Ct. 910, 93 L.Ed.2d 859 (1987). The lead agency in Pennsylvania is DPW.

In this regard, DPW's obligations are set forth in 42 C.F.R. § 431.10. Subsection (b)(ii) requires legal authority for DPW to "[m]ake rules and regulations that it follows in administering the plan or that are binding upon local agencies that administer the plan." Subsection (e)(1) forbids delegation, to other than DPW officials, of authority to:

(i) Exercise administrative discretion in the administration or supervision of the plan, or

(ii) Issue policies, rules, and regulations on program matters.

Subsection (e)(3) mandates that:

If other State or local agencies or offices perform services for [DPW], they must not have the authority to change or disapprove any administrative decision of that agency, or otherwise substitute their judgment for that of [DPW] with respect to the application of policies, rules and regulations issued by [DPW].

This regulation may be enforced by plaintiffs, defendants' argument to the contrary notwithstanding, because the regulation furthers a statute designed to benefit Medicaid recipients and nowhere does Title XIX suggest that standing should not be accorded to plaintiffs.

Plaintiffs have proved that impermissible delegation is a feature of the special transportation plan. Under this plan, DPW would delegate to providers of unexempted services excessive discretion with respect to selection of transportation companies; for example, it would give providers incentives to select unreliable van transporters that limit days and time of service, skimp on attendants, overcrowd vehicles, run excessively long routes, and otherwise operate at improperly low levels of quality. Under this plan, DPW also would delegate discretion with respect to frequency and mode of transportation offered; it would give providers incentives to reduce or eliminate treatment of expensive-to-transport plaintiffs and to force plaintiffs to walk,

by unequal distribution of transportation services.

drive, or take public transportation to therapy before the patients are ready. These delegations violate § 431.10, *see Forsyth County Board of Social Services v. Division of Social Services,* 317 N.C. 689, 346 S.E.2d 414, 416–17 (1986); *Vogel v. Perales,* [1983–2 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 32,878, at 9402–03 (S.D.N.Y.1983); *see also* Op.Att'y Gen. Penn. 76–32, *rescinding id.* 76–18, and create incentives that, based on plaintiffs' documentation of the operating experience under the Block Grant plan and the Transportation Program, I find likely to cause plaintiffs and society to suffer irreparable harm.

Without in any way invading the administrative realm, I note that DPW's responsibility for establishing sufficient transportation networks across Pennsylvania could readily be fulfilled on a county-by-county basis as in the Block Grant plan and the Transportation Program if, based on assessment of Medicaid recipients' need for transportation to therapy, DPW hires and guarantees funding for appropriately qualified transportation companies that promise to pick up and deliver patients as instructed. It would not, however, be proper for DPW to allow county-based transporters or providers to have discretion to limit modes of transportation (some excluding paratransit), times of transportation (some not operating each day or not at night), or frequency of a patient's transportation (some having set quotas on numbers of trips for each patient). Transportation must be sufficient for diagnosed treatment needs and DPW, not transporters and not Medicaid providers, must accept responsibility to ensure that sufficient transportation services exist.

In fulfilling this responsibility, DPW's plan must "be in effect in all political subdivisions of [Pennsylvania], and, if administered by them, be mandatory upon them." 42 U.S.C. § 1396a(a)(1). This statutory duty is implemented by 42 C.F.R. § 431.-50(b), which creates at least two relevant requirements that, for the same reasons as for the other regulations, are enforceable by plaintiffs.

First, the regulation requires that the plan operate uniformly across Pennsylvania. *Turner v. Heckler,* 573 F.Supp. 867, 873 (S.D.Ohio 1983) (collecting cases). This has not been assured in the past by DPW, which has tolerated differences between county transportation systems that create substantial differences in access to psychiatric partial hospitalization services, differences that cannot be explained solely on the basis of geographic conditions, population density, or other neutral factors that would affect access to similar services by non-recipients of Medicaid.

Second, the regulation requires DPW to assure that the plan is continuously in operation in all local offices or agencies through—

(i) Methods for informing staff of [DPW] policies, standards, procedures, and instructions;

(ii) Systematic planned examination and evaluation of operations in local offices by regularly assigned state staff who make regular visits; and

(iii) Reports, controls, or other methods.

This has not been done in the past by DPW's understaffed, underfunded, and underemphasized in-house monitoring program for psychiatric partial hospitalization services.

■ For the future, DPW's plans must recognize the need for uniformity, which would be assured in large part by avoiding improper delegation of responsibility, and the need for active supervision of day-to-day operations of transportation systems, including site visits and gathering reports from Medicaid transporters, providers, and recipients.

### C.

■ In designing and implementing its transportation plan, DPW must comply with two further regulations. One requires giving the medical care advisory committee, in Pennsylvania the Medical Assistance Advisory Committee, proper "opportunity for participation in policy development and program administration, including furthering the participation of re-

cipient members in the agency program." 42 C.F.R. § 431.12(e). The other requires distribution of official rules and policies to all DPW offices and to other accessible resource centers, including libraries, welfare offices and legal services institutions that can publicize this information. 42 C.F.R. § 431.18. These regulations enable independent oversight of DPW's practices, providing a form of quality control. *See Seniors United for Action v. Ray*, 635 F.2d 746, 748 n. 4 (8th Cir.1980).

Due to § 431.12(e), "no significant program or policy change will be made by [DPW] until [the Medical Assistance Advisory Committee] is consulted." Rosenbaum, "Administration of a State Medicaid Program: The Role of the Medical Care Advisory Committee," 11 *Clearinghouse Rev.* 918, 920 n. 13 (1978). "Under the regulation, the [Advisory Committee] should have the opportunity to consider and discuss the available alternative policies, not merely the chance to make minor suggestions concerning a single policy already adopted by the state." *Burgess v. Affleck*, 683 F.2d 596, 599 (1st Cir.1982).

With respect to the current proposal, however, DPW first notified the Consumer Sub-Committee of the Advisory Committee on May 22, 1985. The next day, the full Advisory Committee reviewed the initial formulation of this plan at a meeting.

The minutes reveal that DPW's Deputy Secretary for Medical Assistance "gave a brief background on the methods by which transportation had been assured." Next he identified DPW's concern about rising costs to transport plaintiffs. Then he stated DPW's intent "to increase fees for … psychiatric partial hospitalization services and [to] require that providers assume any financial expenses which may be involved in assuring recipients' transportation…." Finally, he reported that the plan would go into effect "as soon as possible after July 1, 1985."

In a brief dialogue, the Deputy Secretary fielded a few questions and explained that the plan was designed "to provide an incentive to providers to transport patients as economically as possible." This entire presentation took no more than a few moments at the end of a three-hour meeting.

In essence, the plan was conceived fully before the meeting, and an implementation bulletin was published within a week of the Deputy Secretary's talk. This did not satisfy § 431.12(e) and, had DPW taken no further action, might have justified voiding the proposed plan. *See Budnicki v. Beal*, 450 F.Supp. at 556.

However, DPW postponed implementation of the plan and then proceeded under judicial supervision. Meanwhile, the matter was discussed by the Advisory Committee's Consumer Sub-Committee and, at the Advisory Committee meeting of September 26, 1985, the Sub-Committee reported on its deliberations. The minutes record this Sub-Committee's belief that the plan will "impact adversely on recipients" and its presentation of "a resolution demanding that [DPW] meet with providers to remedy the problems." The Deputy Secretary responded to this, prompting the Sub-Committee to withdraw its resolution pending further study. Also, at the October 24, 1985 meeting of the Advisory Committee, the Deputy Secretary reported on this lawsuit and the terms of the preliminary injunction. Since then, the Advisory Committee has had adequate time to follow up on the initial Sub-Committee report and has been advised that plaintiffs consider this issue important. However, neither the Advisory Committee nor any of its individual members have sought to intervene in this action. This persuades me not to postpone resolution of the parties' dispute solely to give the Advisory Committee a chance to comment on the desirable remedy in this case.

With respect to § 431.18, plaintiffs have proved a violation by defendants. This regulation requires DPW to make available "copies of its rules and policies." This cannot be done when, as has taken place under DPW, delegate institutions formulate important limits on plaintiffs' access to services but fail to report these limits to DPW. Even if the particular acts of delegation were proper, the limits would constitute "rules and policies" that must be

made easily available for the public to learn.

Conceding the regulations' validity, defendants argue that plaintiffs lack standing to enforce these administrative requirements. However, both regulations exist to inform Medicaid recipients, not the federal government, and to give the recipients a voice (though not a vote) to inform DPW's decisionmaking process. This information flow improves the fit between Medicaid recipients' needs and program operations; without this information trade, the recipients might be denied any way to prevent DPW from making bad decisions and be limited to after-the-fact challenges as occurred here. After-the-fact challenges often cannot provide victims full relief, and therefore Medicaid recipients must be found to be intended beneficiaries of these rules.

This purpose is authorized by 42 U.S.C. § 1396a(a)(4)(A), and nowhere in Title XIX does Congress expressly or impliedly deny a private right of action to enforce the regulation. Accordingly, I find plaintiffs have standing to enforce their clear rights. *See Wright*, 107 S.Ct. at 774-75.

In sum, defendants' prior acts violated federal regulations and the special transportation plan would cause further violations. These violations provide an independent basis for granting plaintiffs' request for injunctive relief.

## IV.

The violations of Title XIX, including its implementing regulations, establish plaintiffs' right to the relief requested. Therefore, I need not, and will not, address plaintiffs' further claims under the Rehabilitation Act and the Constitution.

In light of the foregoing, DPW will be enjoined from implementing the special transportation plan for plaintiffs. Plaintiffs will, subject to a minor exception to ease the transition, be entitled to the same benefits as other Medicaid recipients under the Transportation Program.

## ORDER

AND NOW, this 24th day of June, 1987, it is ORDERED, ADJUDGED AND DECLARED, as follows:

1. That the "Special Transportation Plan" of the defendants is unlawful, and in violation of Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, to the extent it requires or permits psychiatric partial hospitalization service providers to assure transportation to members of the plaintiff class in exchange for an increase in the hourly rate of payment for therapy.

2. That the members of the plaintiff class are entitled to be provided transportation assured by the Pennsylvania Department of Public Welfare in compliance with federal law, including 42 C.F.R. §§ 431.10, 431.18, 431.50, 431.51, and 431.53.

3. The defendants are enjoined from requiring any provider of psychiatric partial hospitalization service not already operating under such a contract to enter into a contract whereby the provider would assure transportation to members of the plaintiff class in exchange for an increase in the hourly rate of payment for therapy. Existing contracts to that effect may be implemented until September 30, 1987, but not thereafter.

4. That the defendants shall, on or before September 1, 1987, submit to this court a report outlining the steps they have taken or propose to take in order to bring their transportation plan into compliance with federal law. A copy of that report shall be served upon counsel for plaintiffs, who may file objections and/or comments within 10 days thereafter.

## ORDER

AND NOW, this 24th day of June, 1987, it is ORDERED:

That the definition of the class of plaintiffs in this action is hereby amended, so that the class consists of

"all Pennsylvania residents who are or become eligible to receive psychiatric partial hospitalization services subsidized by the Medical Assistance (Medicaid) pro-

gram under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*"